1 | Jeffrey I. Golden, State Bar No. 133040
jgolden@wgllp.com
2 | Faye C. Rasch, State Bar No. 253838
frasch@wgllp.com
3 | **WEILAND GOLDEN GOODRICH LLP**
650 Town Center Drive, Suite 600
4 | Costa Mesa, California 92626
Telephone    714-966-1000
5 | Facsimile    714-966-1002

6 | Attorneys for Chapter 7 Trustee
Jeffrey I. Golden

7 |

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **SANTA ANA DIVISION**

11 | In re

12 | RICHARD J. KELLY AND MARY J. KELLY,

13 | Debtors.

14 |

15 |

16 | JEFFREY I. GOLDEN, Chapter 7 Trustee,

17 | Plaintiff,
v.

18 | NOAM EISEN, an individual,

19 | Defendant.

Case No. 8:19-bk-12127-MW

Chapter 7

Adv. No. 8:20-ap-

**COMPLAINT:**

**(1)  TO AVOID AND RECOVER FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. §§ 544(b) AND 550; AND CALIFORNIA CIVIL CODE §§ 3439.04(a)(1), 3439.07 AND 3439.09;**

**(2)  TO AVOID AND RECOVER FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. §§ 544(b) AND 550; AND CALIFORNIA CIVIL CODE §§ 3439.04(a)(2); 3439.07 AND 3439.09;**

**(3)  TO PRESERVE AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 551; AND**

**(4)  FOR AUTHORIZATION TO SELL REAL PROPERTY IN WHICH CO-OWNER HOLDS INTEREST PURSUANT TO 11 U.S.C. § 363(h)**

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

**TO DEFENDANT AND THE DEFENDANT'S ATTORNEY OF RECORD, IF ANY:**

Plaintiff Jeffrey I. Golden, the duly appointed, qualified and acting Chapter 7 trustee ("Trustee" or "Plaintiff") for the bankruptcy estate ("Estate") of Richard J. Kelly and Mary J. Kelly ("Debtors"), hereby files this Complaint (1) To Avoid and Recover Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544(b) and 550; and California Civil Code §§ 3439.04(a)(1), 3439.07, and 3439.09; (2) To Avoid and Recover Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544(b) and 550; and California Civil Code §§ 3439.04(a)(2), 3439.07, and 3439.09; (3) To Preserve Avoided Transfers Pursuant to 11 U.S.C. § 551; and (4) For Authorization to Sell Real Property in Which Co-Owner Holds Interest Pursuant to 11 U.S.C. § 363(h) ("Complaint") against Noam Eisen, an individual, ("Defendant") and alleges that:

## REQUIRED PLEADING DISCLOSURE

1.      In accordance with the requirements of Local Bankruptcy Rule 7008-1, the Plaintiff hereby alleges that the claims for relief set forth in the Complaint constitute a core proceeding under 28 U.S.C. § 157(b), in that the claims for relief relate directly to property which may be property of the Debtors and, therefore, property of the Estate. Regardless of whether the claims for relief are core or non-core, Plaintiff hereby consents to the entry of final orders and judgment by the Bankruptcy Court, except as may be precluded by applicable law.

## STATEMENT OF JURISDICTION AND PROCEEDINGS

2.      Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a), in that this is a proceeding arising in and/or related to the bankruptcy Estate of the Debtors currently pending in the Santa Ana Division of the United States Bankruptcy Court for the Central District of California ("Bankruptcy Court") Pursuant to 28 U.S.C. § 1391(b)(2), venue is appropriate in this Central District of California as the acts and conduct complained of herein took place within this district. Accordingly, this Court also has personal jurisdiction over the Defendant.

3.      The Bankruptcy Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§157(b)(1) and 1334(a) and General Order No. 242-A of the District Court for the Central District of California, because this is a core proceeding under 28 U.S.C. § 157(b)(1) and (2)(F) and (H).

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

4.     On May 31, 2019 ("Petition Date"), Debtors filed a voluntary petition under Chapter 7 of Title 11 of the United States Code commencing the related bankruptcy case ("Bankruptcy Case") designated case number 8:19-bk-12127-MW.

### PARTIES

5.     Plaintiff is the chapter 7 trustee of the estate, and brings this action for the benefit of the bankruptcy estate and its creditors. To the extent that Plaintiff hereby asserts claims under 11 U.S.C. § 544(b), Plaintiff is informed and believes and, on that basis alleges thereon, that there exists in this case one or more creditors holding unsecured claims allowable under 11 U.S.C. §502 or that are not allowable only under 11 U.S.C. § 502(e) who could have avoided the transfers or obligations under California or other applicable law before the Petition Date.

6.     Plaintiff is informed and believes and based thereon alleges that Defendant is an individual residing in San Francisco, California. At all relevant times, Defendant was an individual for whose benefit the recoverable transfers alleged.

### FACTS COMMON TO ALL CLAIMS FOR RELIEF

7.     The Plaintiff was appointed after the Petition Date.  As a result, the Plaintiff does not have personal knowledge of all of the facts alleged herein relating to events that occurred before the Petition Date and, therefore, alleges such facts on information and belief.

8.     The Plaintiff is informed and believes and based thereon alleges that on June 9, 2010, a group of Dr. Richard Kelly's ("Dr. Kelly") co-workers and partners commenced litigation against him in the Superior Court of the State of California ("State Court Litigation") asserting claims for, inter alia, breach of fiduciary duty and conversion.

9.     The Plaintiff is informed and believes and based thereon alleges that after a lengthy arbitration, on October 19, 2016, the arbitrator entered the first phase of his award (the "First Phase") during which the arbitrator found Dr. Kelly liable for breach of fiduciary duty, breach of contract and conversion. (the "Arbitration Award").  A true and correct copy of the Arbitration Award is attached hereto as Exhibit "1."

10.     The Plaintiff is informed and believes and based thereon alleges that the arbitrator further determined that fees and costs should be awarded to the plaintiffs in addition to their

WEILAND Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  consequential damages and a second phase (the "Second Phase") of the arbitration was needed

2  simply to determine fees and costs.

3      11.     The Plaintiff is informed and believes and based thereon alleges that in February of

4  2017, a judgment (the "Judgment") was entered against Dr. Kelly and his related corporation in the

5  approximate amount of $1.3M Dollars, within which it was determined that R. Kelly converted

6  funds from his co-works at the medical practice he managed for his own use.  A true and correct

7  copy of the Judgment is attached as Exhibit "2."

8      12.     The Plaintiff is informed and believes and based thereon alleges that pursuant to that

9  certain Grant Deed recorded with the San Francisco Assessor-Recover on January 4, 2005 (the

10  "2005 Deed") the Debtors, along with Defendant, purchased the real property located at 700

11  Illinois Street, #204, San Francisco, California 94107 ("Property") for the sum of $845,000 and

12  held title as tenants in common.

13      13.     The Plaintiff is informed and believes and based thereon alleges that the purchase

14  was financed with an interest only loan.

15      14.     The Plaintiff is informed and believes and based thereon alleges that the Property is

16  a three bedroom, three bathroom luxury condominium containing 1,894 square feet of living space

17  located in a mid-rise residential building in downtown San Francisco with an approximate value of

18  $1,700,000.

19      15.     The Plaintiff is informed and believes and based thereon alleges that on November

20  8, 2016, less than one month after First Phase and entry of the Arbitration Award, the Debtors

21  transferred their interest in the Property to Defendant for the sum of $152,000 (the "Transfer").

22      16.     The Plaintiff is informed and believes that in December 2016, just two months after

23  the First Phase of the Arbitration Award has been articulated by the arbitrator, the Debtors Private

24  Retirement Trust (the "PRT") was created.

25      17.     The Plaintiff is informed and believes that on August 25, 2017, the Debtors

26  transferred their interest in the Property to the PRT for the same purchase price of $152,000.

27      18.     The Plaintiff is informed and believes that the Debtors immediately funded the PRT

28  with a $550,000 lump sum cash deposit.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

**FIRST CLAIM FOR RELIEF**

(To Avoid and Recover Fraudulent Transfer Pursuant to 11 U.S.C.

§§ 544(b) and 550, and California Civil Code §§ 3439.04(a)(1),

3439.07, and 3439.09)

19.     The Plaintiff incorporates each and every allegation contained in paragraphs 1 through 18 as though fully set forth herein.

20.     The Plaintiff is informed, believes, and alleges that the Transfer occurred during the four-year period immediately preceding the Petition Date.

21.     The Plaintiff is informed, believes, and alleges that the Transfer was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

22.     The Plaintiff is informed, believes, and alleges that the Debtors received no or inadequate consideration from the Transfer.

23.     The Plaintiff is informed, believes, and alleges that the Debtors were insolvent at the time of the Transfer and/or were rendered insolvent by virtue of the Transfer.

24.     The Plaintiff is informed, believes, and alleges that Defendant is a transferee within the meaning of 11 U.S.C. § 550(a).

25.     By reason of the foregoing, the Transfer is avoidable, and Plaintiff is entitled to set aside the Transfer pursuant to 11 U.S.C. § 544(b) and California Civil Code §§ 3439.04(a)(1), 3439.07, and 3439.09 and Plaintiff is entitled to recover the Transfer or the value of the Transfer for the benefit of the Estate pursuant to 11 U.S.C. § 550.

**SECOND CLAIM FOR RELIEF**

(To Avoid and Recover Fraudulent Transfer Pursuant to 11 U.S.C.

§§ 544(b) and 550, and California Civil Code §§ 3439.04(a)(2),

3439.07, and 3439.09)

26.     The Plaintiff incorporates each and every allegation contained in paragraphs 1 through 25 as though fully set forth herein.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

27.    The Plaintiff is informed, believes, and alleges that at the time of the Transfer, Debtors believed, or reasonably should have believed, that they would incur debts beyond their ability to pay as they became due.

28.    The Plaintiff is informed, believes, and alleges that the Transfer was made to and for the benefit of Defendant.

29.    The Plaintiff is informed, believes, and alleges that Defendant is a transferee within the meaning of 11 U.S.C. § 550(a).

30.    The Plaintiff is informed, believes, and alleges that Debtors did not receive reasonably equivalent value for making the Transfer and did not make the Transfer in good faith.

31.    By reason of the foregoing, the Transfer is avoidable, and Plaintiff is entitled to set aside the Transfer pursuant to 11 U.S.C. § 544(b) and California Civil Code §§ 3439.04(a)(2), 3439.07 and 3439.09 and Plaintiff is entitled to recover the Transfer or the value of the Transfer for the benefit of the Estate pursuant to 11 U.S.C. § 550.

### THIRD CLAIM FOR RELIEF

(To Preserve Avoided Transfers Pursuant to 11 U.S.C. § 551)

32.    The Plaintiff incorporates each and every allegation contained in paragraphs 1 through 31 as though fully set forth herein.

33.    Pursuant to 11 U.S.C. § 551, the Transfer is preserved for the benefit of the Estate because the Transfer is avoidable under § 550 as set forth above.

### FOURTH CLAIM FOR RELIEF

(For Authorization to Sell the Estate's Interest and the Interest of Defendant in the Property
Pursuant to 11 U.S.C. § 363(h))

34.    The Plaintiff incorporates each and every allegation contained in paragraphs 1 through 33 as though fully set forth herein.

35.    The Plaintiff is informed and believes, and based thereon alleges, that partition in kind of the Property among the Estate and Defendant is impracticable.        The Plaintiff is informed and believes, and based thereon alleges, that the sale of the Estate's undivided interest in the

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Property would realize significantly less for the Estate than the sale of the Property free of the

2  interests of Defendant.

3       36.    The Plaintiff is informed and believes, and based thereon alleges, that the benefit to

4  the Estate of a sale of the Property free of the interests of Defendant outweighs the detriment, if

5  any, to Defendant.

6       37.    The Plaintiff is informed and believes, and based thereon alleges, that the Property

7  is not used in the production, transmission, or distribution, for sale, of electric energy or of natural

8  or synthetic gas for heat, light, or power.

9       38.    For the aforementioned reasons, Plaintiff may sell both the Estate's interest, under

10  11 U.S.C. § 363(b), and the interests of Defendant in the Property pursuant to 11 U.S.C. § 363(h).

11

12       **WHEREFORE**, the Plaintiff prays that this Court enter a judgment against the Defendant

13  as follows:

14       <u>**On the First Claim for Relief**</u>

15       1.    Avoiding the Transfer and declaring that the Transfer be annulled and rendered void

16  as a fraudulent transfer and for recovery of the value of the Transfer for the benefit of the Estate;

17  and/or

18       2.    Awarding the Plaintiff a money judgment against the Defendant in the amount of

19  the Transfer.

20       <u>**On the Second Claim for Relief**</u>

21       3.    Avoiding the Transfer and declaring that the Transfer be annulled and rendered void

22  as a fraudulent transfer and for recovery of the value of the Transfer for the benefit of the Estate;

23  and/or

24       4.    Awarding the Plaintiff a money judgment against the Defendant in the amount of

25  the Transfer.

26       <u>**On the Third Claim for Relief**</u>

27       5.    For preservation of the Transfer for the benefit of the Estate.

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1281969v1

COMPLAINT

1

### On the Fourth Claim for Relief

2
    6.  For judgment that the Plaintiff may sell the Estate's interest, pursuant to 11 U.S.C.

3
        § 363(h), in the Property.

4

### On all Claims for Relief

5
    7.  For judgment awarding attorney's fees and costs to the Plaintiff;

6
    8.  For judgment awarding such other and further relief as the Court deems just and proper.

7
               Respectfully submitted,

8
Dated:  September 23, 2020        WEILAND GOLDEN GOODRICH LLP

9

10
              By:  /s/ Faye C. Rasch

11
                  FAYE C. RASCH
                  Counsel for Chapter 7 Trustee
                  Jeffrey I. Golden

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

# EXHIBIT 1

EXHIBIT 1:  Page 000001 of 000036

1 | NEIL L. SHAPIRO (SBN 051547)
LAW OFFICES OF NEIL L. SHAPIRO
2 | 2100 Garden Road, Suite C
Monterey, California  93940
3 | Telephone:  (831) 372-3700
Facsimile:  (831) 372-3701
4
ARBITRATOR
5

6

7 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

8 | COUNTY OF MONTEREY

9

10

| | |
|---|---|
| BRIDGET BAILEY-TREGENZA, D.O.; BRIDGET BAILEY-TREGENZA, D.O., INC.; HEINRICH A. BRINKS, M.D.; HEINRICH A. BRINKS, M.D., A PROFESSIONAL CORPORATION; JAMES FIELD, M.D.; JAMES EMORY FIELD, M.D., INC.; ARNO HANEL, M.D.; ARNO H. HANEL, M.D., INC.; MICHAEL J. HERHUSKY, M.D.; MICHAEL J. HERHUSKY, M.D., INC.; JOEL NAGAFUJI, M.D.; JOEL NAGAFUJI, M.D., INC.; ANDREY RYCHKOV, M.D.; ANDREY RYCHKOV, M.D., INC.; MICHAEL C. SCANNEL, M.D.; MICHAEL C. SCANNEL, M.D., INC.; ELLIOT SCHERLING, M.D.; SCHERLING MEDICAL, INC.; JON STACKPOLE, M.D.; AND STACKPOLE, M.D., | Case No.  M106308 **ARBITRATION AWARD** |

Plaintiffs,

v.

RICHARD KELLY, MD; RICHARD KELLY, MD, INC.; CARMEL HEALTHCARE ANESTHESIA MEDICAL PROVIDERS, INC., AND DOES 1 THROUGH 100.

Defendants.

AND RELATED CROSS-ACTION

ARBITRATION AWARD
Case No. M106308

18                                                          EXHIBIT 1

EXHIBIT 1     PAGE 9

EXHIBIT 1:  Page 000002 of 000036

**PRELIMINARY STATEMENT**

1
2
3        The parties to the above-captioned matter stipulated, and the Arbitrator ruled, that the
4   arbitration would be bifurcated.  More specifically, the parties and the Arbitrator agreed that phase
5   one of the arbitration would address all issues of liability and damages, following which the Arbitrator
6   would issue a preliminary arbitration award as to those subjects.  Thereafter, and based on the
7   determinations made in that preliminary award, phase two of the arbitration would address any issues
8   raised by the parties regarding attorney's fees and costs, and if the preliminary award found any party
9   liable for exemplary damages, the amount thereof.  Following that further hearing, or the waiver of all
10  parties of any such claims, the Arbitrator would issue a final award.
11
12                          **THE ARBITRATION OF PHASE ONE**
13
14       Phase one of the arbitration hearing in the above-captioned matter took place on June
15  21-24, June 27-28, and July 11-14, 2016, before Neil L. Shapiro, the Arbitrator.  In addition to live
16  testimony, the parties stipulated that the deposition transcripts of James Field, M.D., Elliott Scherling,
17  M.D., Steven Packer, M.D., Michael Mellenthin, M.D., Carol Lucas, Frank Gamma and Virginia
18  Weathers would be made part of the record in their entirety, in lieu of live testimony.  Douglas
19  Oldfield appeared for all Plaintiffs, and for Cross-Defendant Ventana Anesthesia Associates, Inc.,
20  Philip Borowsky and William Jacobson appeared for Defendants and Cross-Complainants Richard
21  Kelly, M.D., Richard Kelly, M.D., Inc., and Carmel Healthcare Anesthesia Medical Providers, Inc.,
22  and  Bernard Greenfield and Edward Colbert appeared for all Cross-Defendants except Ventana
23  Anesthesia Associates, Inc.  On September 23, 2016, the parties submitted post-hearing briefs and
24  phase one of the arbitration was deemed submitted.  The Arbitrator now rules on the issues arbitrated
25  in phase one:
26                          **FACTUAL BACKGROUND**
27
28       Community Hospital of the Monterey Peninsula, a California non-profit public benefit

EXHIBIT 1     PAGE 10

EXHIBIT 1:  Page 000003 of 000036

1   corporation ("CHOMP") owns and operates an acute care hospital in Monterey, California, in which it

2   provides, *inter alia*, anesthesia services for its surgery, emergency and obstetrical departments.  For

3   many years, the anesthesiologists providing those services at CHOMP have not been employees of

4   CHOMP.  Rather, CHOMP sequentially contracted with separate corporations that employed the

5   anesthesiologists directly and was responsible for providing them to CHOMP as needed.  Until

6   approximately April of 2007, CHOMP had such a contractual relationship with Monterey Peninsula

7   Anesthesia Medical Group, Inc. ("MPAMG").  Over time, CHOMP became disenchanted with

8   MPAMG, in large part, as several witnesses testified, because of its management structure.  More

9   specifically, the anesthesiologists employed by MPAMG were its shareholders as well, and each

10   shareholder had an equal voice in making management decisions for MPAMG.  Any decision required

11   that a quorum be present at a meeting, and a majority vote of those present.  MPAMG lacked the

12   prompt responsiveness required by CHOMP.

13        Effective May 1, 2007, CHOMP terminated its contractual relationship with MPAMG

14   and entered into a similar contract with Elite Anesthesia Medical Group, Inc. ("Elite").  It quickly

15   became obvious to both CHOMP and Elite that the latter was incapable of performing its obligations

16   under the CHOMP/Elite agreement, and the agreement was terminated by mutual agreement.

17   CHOMP then invited those anesthesiologists with staff privileges and active anesthesiology practices

18   at CHOMP – which consisted primarily of the anesthesiologists who had been part of MPAMG – to

19   propose a new agreement that would meet CHOMP's goals with respect to the provision of anesthesia

20   services.

21        Defendant and Cross-Complainant Richard Kelly ("Kelly") commenced working at

22   CHOMP in the latter part of 2006, but was never a part of MPAMG.  He came with excellent

23   credentials, having received his medical degree from Stanford University specializing in cardiac

24   anesthesia.  In addition to his medical degree he has a Master's Degree in Public Health from the

25   University of California at Berkeley and a JD degree from Stanford University.  At all times here

26   relevant Kelly was authorized to practice law in the State of California.  Kelly testified, without

27   contradiction, that he never had a legal practice and never provided legal services to any client.

28        When CHOMP invited its anesthesiologists to submit a proposal for a new agreement,

EXHIBIT 1     PAGE 11

EXHIBIT 1:  Page 000004 of 000036

1   they did so.  Kelly took the laboring oar in drafting the proposal on behalf of a corporation to be

2   formed under the name Carmel Healthcare Anesthesia Medical Providers, Inc. ("CHAMP").  A key

3   difference between the MPAMG/ CHOMP agreement and the proposal made on behalf of CHAMP

4   was the proposed governance of CHAMP.  Under the proposal, the "CHAMP Executive Committee

5   will consist of three anesthesiologists who are responsible for providing the clinical and organizational

6   leadership for the group and will be charged with making the day-to-day decisions on behalf of the

7   group."  That part of the proposal suggested control by a core group rather than the "democratic"

8   process that plagued MPAMG.  The proposal also provided that the three members of the Executive

9   Committee would be Drs. Michael Scannell, Michael Herhusky, and Kelly.  Exhibit 17.

10          In part because of the desire of CHOMP and CHAMP to get CHAMP organized and

11   fully functioning as quickly as possible, CHOMP agreed to retain on behalf of both entities but at its

12   sole expense Maury Parrish, a consultant with expertise in forming medical organizations. One of

13   Parrish's early actions was to establish the Formation Committee ("FC").  Parrish was a member of

14   that committee, along with Drs. Scannell, Herhusky and Kelly representing CHAMP and Anthony

15   Chavis, M.D., and Angie Inlow representing CHOMP.  The FC was charged with the responsibility of

16   meeting regularly to resolve all CHAMP formation issues, to agree to appropriate contract terms, and

17   the like in an effort to achieve for CHAMP a "go-live" date of October 1, 2007.

18          Throughout the FC process, it was always agreed that Drs. Michael Scannell

19   ("Scannell"), Michael Herhusky ("Herhusky"), and Kelly would be the officers of CHAMP –

20   Herhusky as president, Scannell as vice-president and Kelly as secretary – as well as its board of

21   directors and the members of its Executive Committee.  The eventual CHOMP/ CHAMP agreement

22   demonstrates the importance to CHOMP of this specific governance structure.  In Paragraph 8.4(e) of

23   that contract, CHOMP reserves the right to "terminate this agreement upon a determination that

24   Michael Herhusky, M.D., Richard Kelly, M.D., and Michael Scannell, M.D., cease to be shareholders,

25   officers and directors of CHAMP or to exercise substantial control and direction over the affairs of

26   CHAMP . . ."  Exhibit 18.

27          There was also agreement with respect to the structure of CHAMP, a "corporation of

28   corporations."  More specifically, Kelly proposed that each of the anesthesiologists be required to

EXHIBIT 1    PAGE 12

EXHIBIT 1:  Page 000005 of 000036

1  establish his or her own professional medical corporation, and that those corporations in turn would

2  contract with CHAMP.  CHAMP would be a pass-through entity, with virtually no assets of its own

3  and with no monetary value.  Monies would flow from CHOMP to the individual corporations

4  through CHAMP, and CHAMP effectively would deduct the modest costs of its operation and remit

5  the balance to the anesthesiologists based on the number of "units" each had completed in the relevant

6  month.  CHOMP was to advance to CHAMP enough each month to pay the CHAMP

7  anesthesiologists their full billings for the preceding month – without making them wait for insurance

8  companies or Medicare to remit payment for the billed units – together with the subsidy CHOMP

9  added to each unit to make the compensation levels for the anesthesiologists more attractive, which

10  aided in recruitment and retention of anesthesiologists.  CHAMP deducted from the sums paid by

11  CHOMP the projected amount necessary to cover the costs of CHAMP's operations.  Any withheld

12  funds not actually spent by CHAMP were distributed to the CHAMP anesthesiologists periodically as

13  a "bonus" allocated on a "units worked" basis, as CHAMP was never supposed to have any profit or

14  assets.  As CHAMP collected from payors, it remitted the money so collected to CHOMP.

15       In mid-June of 2007, Kelly took a number of steps to incorporate CHAMP, but did not

16  tell either Herhusky or Scannell that he had done so.  He caused an attorney service to file Articles of

17  Incorporation for CHAMP.  He executed a stock purchase agreement as President and Chairman, as

18  Secretary, and as the prospective shareholder.  He issued himself a certificate evidencing his

19  ownership of all 10,000 shares of CHAMP, executing the certificate as both president and secretary.

20  He signed minutes of an organizational meeting of CHAMP at which he appointed himself as

21  president, secretary, and chief financial officer.  He also appointed himself as sole director, and he

22  filed with the Secretary of State at inception and annually thereafter a Statement of Information on

23  which he confirmed that he held all corporate offices.  Exhibits 7, 11 and 48.  Initially he shared none

24  of this information with anyone connected with CHAMP.  He did disclose in the late summer of 2007

25  that he was the sole shareholder of CHAMP, but assured his colleagues that the issuance of the stock

26  to him was simply to get CHAMP fully formed and that the shares would be transferred as the FC or

27  the Executive Committee determined.  But Kelly did not disclose that he as the sole board member

28  never formally appointed Herhusky and Scannell as officers or directors, nor did he create an

EXHIBIT 1    PAGE 13

EXHIBIT 1:  Page 000006 of 000036

1  Executive Committee.[1] Kelly honored none of the normal corporate formalities; he held no meetings,

2  took no action by written consent, and kept no minutes until 2012, during this litigation, when he

3  retroactively created minutes for meetings that were never held to document actions – such as the

4  appointment of Herhusky and Scannell as officers and members of the Executive Committee – that

5  never occurred.  Exhibit 84.

6          Kelly said in mid-2007, repeated through the term of the CHOMP/CHAMP agreement,

7  and through this litigation, that he did not want to own the shares, or to worry about the liability risks

8  that such ownership could bring.  CHAMP's proposal to CHOMP included the statement that shares

9  of stock in CHAMP would not be made available to the CHAMP anesthesiologists.  The proposal was

10  drafted in large part by Kelly, and he said that he believed that the stock should be held by a "friendly

11  physician" – an outsider with no interest in CHAMP.  Kelly reasoned that such form of ownership

12  would avoid the problems caused by MPAMG's equal division of authority and equal voting rights,

13  and would obviate the concerns that having one or more, but not all, of the CHAMP anesthesiologists

14  own the shares would risk internal discord.  Parrish opposed the "friendly physician" idea, and

15  testified that Kelly took him aside one day and told him, in effect, to back off.  The FC considered the

16  issue of who should own the stock a number of times during its months of existence.  A couple of

17  potential "friendly physician" owners were discussed, but the idea did not advance further.  When

18  Kelly learned at an FC meeting that at an earlier meeting that he did not attend the FC decided to have

19  the stock owned by a CHAMP  insider – Elliott Scherling, M.D. – Kelly left the room after making

20  the statement that he could shut the whole thing down.  While maintaining at all times his arguments

21  in support of his "friendly physician" mechanism, Kelly at one point agreed to convey the shares

22  equally to Herhusky, Scannell and himself, and at another to convey equal interests to the "founders"

23  of CHAMP.  But despite these agreements, none of the stock was ever transferred to anyone else.

24  And when asked when such transfer would happen, Kelly responded by saying he was looking into

25  how to accomplish it properly, or that he had been busy, or that there was some other reason it had not

26

27  [1]  Under CHAMP's by-laws, such a committee could be composed of two or more members of the
board of directors.  Kelly at all relevant times was the sole director, making the appointment of such a
28  committee inconsistent with the requirements of the by-laws.

EXHIBIT 1    PAGE 14

EXHIBIT 1:  Page 000007 of 000036

1  been done.  Whatever the reason(s), Kelly still holds all of the outstanding shares of CHAMP.

2              The term of the CHOMP/CHAMP agreement was for three years – July 1, 2007,

3  through June 30, 2010.  The agreement also provided that the agreement "may be renewed or

4  extended for an additional term . . ." but that "renewal or extension is neither express nor implied."

5  Exhibit 18, p.11.  As the expiration date approached, and after CHOMP management made comments

6  to the effect that renewal was not a certainty, tensions between Kelly on the one hand and the rest of

7  the CHAMP anesthesiologists on the other that had bubbled largely under the surface for varying

8  periods of time came to the fore.  And as concern grew over the possible non-renewal of the

9  CHOMP/CHAMP contract, and the consequences that such non-renewal would bring, the areas of

10 disagreement became more pronounced and the relationship between Kelly and the other CHAMP

11 anesthesiologists deteriorated even more.

12             A prominent area of contention was Kelly's activity regarding Sequoia Hospital in

13 Redwood City, primarily his (1) unavailability to take cases at CHOMP because he was handling

14 cases at Sequoia Hospital, and (2) his effort to strike a deal with Sequoia Hospital that would result in

15 CHAMP providing anesthesia services to that facility.  Kelly was "on call" 365 days each year, for

16 which he was paid $200 per day.  That status meant that, unless other arrangements were made in

17 advance, Kelly had to be able to get to CHOMP within 30 minutes of a call.  In 2010, Dr. Chavis was

18 informed by Tom Housen, head nurse and director of the main operating room at CHOMP, that Dr.

19 Kelly on occasion was unable to fulfill his call obligations because he was handling cases at Sequoia

20 Hospital.  Several CHAMP anesthesiologists were required to cover cases, including a couple of

21 cardiac cases, for which Kelly was on call, but for whatever reason did not respond when called.  As

22 their testimony made clear, failing to respond when called created the real risk that a patient would not

23 receive the level of medical service he or she needed, with the potential for serious consequences

24 obvious.  Kelly insisted that whenever he was going to be away and unable to respond to a call, he

25 went through a thorough process to be certain that all cases were covered.  Kelly testified that he

26 never missed or declined to honor a call.  The testimony of others who in fact had to cover for him

27 when he did not receive or honor a call very strongly suggests otherwise.

28             The fact that Kelly was handling cases at Sequoia was confirmed to Dr. Chavis by

EXHIBIT 1     PAGE 15

EXHIBIT 1: Page 000008 of 000036

1   Glenna Vaskelis, CEO of Sequoia. Dr. Chavis reported this information to Steven Packer, M.D.

2   ("Packer"), the CHOMP CEO. Packer responded to that information by way of a letter provided to

3   Kelly on March 11, 2010, in which Packer made very clear his and CHOMP's viewpoint about

4   Kelly's activities with Sequoia. Exhibit 49. "[W]e want to be very clear that CHOMP does not

5   support nor endorse the current practice of leaving CHOMP inadequately covered for cardiac

6   anesthesia while pursuing broader strategies in the San Francisco bay area." The letter underscored

7   that CHOMP wanted to expand its cardiac anesthesiologist program and had no interest in any

8   arrangement with Sequoia. The letter also expressed Packer's concerns that "an excellent candidate

9   for a position in cardiac anesthesia was interviewed, was interested in joining CHAMP, and

10  perplexingly was not offered a position." The letter suggested that Kelly "immediately move to

11  rectify this situation by:  1) not providing anesthesia services at Sequoia or any other hospital outside

12  a 30-minute response time while on call at CHOMP; 2) reopening discussions with the anesthesia

13  recruit interviewed at CHOMP for full-time employment with CHAMP; or alternatively, 3)

14  aggressively recruiting for an alternative full-time cardiac anesthesiologist to join CHAMP and

15  practice at CHOMP." And the letter informed Kelly that his "timely, personal and genuine resolution

16  of these concerns will be of great importance as we begin to consider contract renewal with CHAMP."

17          The letter of March 11, 2010, was followed by a meeting between Packer and Kelly in

18  which the former informed the latter, with emphasis, that CHOMP was not interested in any

19  relationship between its anesthesiologists and those at Sequoia, and that Kelly needed to focus on his

20  responsibilities on CHOMP. Witnesses described Packer as very angry, and reported that the volume

21  of his voice was significant. Kelly testified that the meeting went very well, and that he was pleased

22  with the discussion. Packer recalls it otherwise. Packer also provided a copy of that March 11, 2010,

23  letter to Herhusky and warned him that if he and Scannell did not get a handle on the problems at

24  CHAMP its chances at gaining a renewal of its contract with CHOMP might not be so good.

25          Eight days following his receipt of the March 11, 2010, letter from Packer, and after

26  their meeting, Kelly sent an email to Glenna Vaskelis at Sequioa in which he confirmed an upcoming

27  meeting with her and to which he attached a draft agreement between CHAMP and Sequoia for the

28  provision of anesthesia services by CHAMP at Sequoia. Exhibit. 50. On March 26, 2010, Kelly had

EXHIBIT 1     PAGE 16

EXHIBIT 1:  Page 000009 of 000036

1   an extended meeting with Vaskelis, and attended a dinner with members of the anesthesia practice at

2   Sequoia.  Exibits 51-53, 56.  His intent was to reach an agreement under which CHAMP would

3   provide anesthesia services at Sequoia, and then to introduce that model of relationship to any number

4   of other hospitals. He even said to Angie Inlow, who was at that time acting as a paid CHAMP

5   consultant to form a relationship between CHAMP and Sequoia, that if they were successful he would

6   not need to practice medicine any longer.  Kelly did not inform Herhusky or Scannell about these

7   activities, did not copy them on the referenced emails, did not invite them to meet with anyone at

8   Sequoia, and did not tell them that CHAMP had retained Angie Inlow to assist Kelly in this regard.

9   Kelly earlier had asked his colleagues what they thought about the possibility of taking cases at

10  Sequoia, and the response – that they had no such interest – was nearly unanimous.  They were not

11  pleased when they learned that Kelly was defying their wishes, and the wishes of CHOMP, even after

12  Packer's letter of March 11, 2010, and its reference to contract renewal.

13          One of CHOMP's goals throughout its relationship with CHAMP was to increase its

14  capacity for cardiac surgery.  As part of that process, CHOMP wanted to recruit a second trained

15  cardiac anesthesiologist.  In August of 2009, after seeing a posting for that position, Boston resident

16  Matthew Fritch ("Fritch") submitted an application. He was offered an interview date in September of

17  2009, and he accepted.  When he arrived for dinner the evening following his interview, he discovered

18  that Joel Nagafuji ("Nagafuji"), whom he knew from an earlier residency, had just joined CHAMP a

19  month or so earlier.  After dinner Fritch told Kelly that he was interested in the position.  Kelly told

20  Fritch that because he was a trained cardiac anesthesiologist, it would be more difficult for CHAMP to

21  hire him.  He did not explain why; and Fritch was perplexed.  Approximately a month  later, Kelly

22  sent an email to Fritch informing him that CHAMP was  interested in having him work at CHOMP,

23  and that Kelly would have CHOMP's credentialing office send him an application for privileges.

24          Near the end of 2009, Fritch contacted Kelly to express his serious interest in the

25  position. Kelly told Fritch that he would contact him after the holidays. At about the same time,

26  Fritch began talking with Nagafuji, who told Fritch that the members of CHAMP were being told by

27  Kelly that Fritch was not really interested in the job, that he wanted a more academic practice, that he

28  wanted more cardiac cases and fewer general or obstetric cases, and that he did not like the

EXHIBIT 1     PAGE 17

EXHIBIT 1:  Page 000010 of 000036

1    community setting.  On January 27, 2010, and having heard nothing from Kelly since November of

2    2009, Fritch contacted Kelly by email to express his continuing interest in joining CHAMP.  Kelly

3    told Fritch in an email sent on March 12, 2010, that his application was not progressing because Kelly

4    was in negotiations with an anesthesiologist group at a different hospital regarding a potential merger,

5    negotiations that included the administrations of both hospitals.  On March 21, 2010, Fritch informed

6    Kelly by email that he had another offer, and that although he preferred to join CHAMP he might

7    have to accept the other position if CHAMP did not finalize an arrangement with him.  A week later

8    Kelly responded and provided a proposed contract.  When provided, that proposed contract required

9    Fritch to provide services at Sequoia, despite the fact that Fritch had told Kelly that he would not work

10   at Sequoia, and despite the contents of Exhibit 49, and the meeting that followed it.  In mid-April of

11   2010, Packer and Scannell were in the Boston area with their wives and took Fritsch and his wife to

12   dinner in an effort to get him to practice at CHOMP.  Shortly thereafter Fritch agreed to accept

13   CHAMP's offer.

14            Another area of friction that bubbled under the surface until the early part of 2010 was

15   the inability of CHAMP anesthesiologists to obtain full financial information about CHAMP.  At

16   different times, several of the CHAMP anesthesiologists tried to contact Robert Bianchi, CPA, whose

17   firm provided accounting services to CHAMP from its formation in 2007 until 2014, to obtain

18   financial information from him.  None was able to speak directly with Bianchi – his office referred

19   them to one of his employees instead – and they were then told that such information could only be

20   released to them with Kelly's approval.  Bianchi testified at the arbitration hearing that from "day

21   one" his instructions from Kelly were not to disclose any financial information to anyone unless Kelly

22   told him to do so.  Scannell testified that early in CHAMP's existence he contacted Sierra, CHAMP's

23   billing service, and asked for some limited financial information.  He was told that he would have to

24   ask Kelly for that information.

25            Kelly was responsible for scheduling.  Several CHAMP anesthesiologists complained

26   to Herhusky and Scannell that instead of following the agreed "random rotation" process, Kelly was

27   manipulating the scheduling for the department such that while he handled many of the lucrative cases

28   – such as cardiac cases – he avoided setting himself up to be assigned to less lucrative cases or for

EXHIBIT 1    PAGE 18

1  shifts on call at the hospital when he might get no cases at all.  In addition, they complained, he

2  managed to have the vast majority of his cases during the regular work week, with minimal

3  assignments that interfered with his evenings and weekends.  And they complained that Kelly handled

4  no cases at Monterey Peninsula Surgery Center ("MPSC"), while almost everyone else did.  The out-

5  patient surgeries at MPSC were far less lucrative than the more complex surgeries performed at

6  CHOMP.  Thomas Wilson, the CEO and Managing Director of Wellspring Associates, which

7  provided management services to MPSC, testified that Kelly performed no cases at MPSC.  Herhusky

8  and Scannell raised these concerns with Kelly, who simply disputed the accuracy of the complaints.

9          Both Herhusky and Scannell were aware of Packer's March 11, 2010, letter to Kelly

10  and its statement about the upcoming negotiations for the possible renewal of the CHOMP/CHAMP

11  contract, and both had heard Packer's warning to pull things together or the contract would be at risk.

12  Both were concerned about the possibility that CHAMP could lose that contract.  Packer suggested as

13  much to Scannell when he quizzed Scannell briefly in March of 2010 about whether Kelly was

14  missing calls and attempting to put CHAMP into a contract with Sequoia.  Herhusky and Scannell

15  discussed their concerns with the other CHAMP anesthesiologists, as they sought to defuse a difficult

16  set of circumstances.

17          Those discussions led to the drafting by Herhusky and Scannell of a letter dated April

18  16, 2010, to Kelly from the other CHAMP physicians that listed their concerns.  Exhibit 57.  The

19  letter closed by listing a series of restorative steps that Kelly must undertake in the next ten days "[i]f

20  we are to continue to practicing [sic] together under the CHAMP Professional Anesthesia Services

21  Agreements."  The letter requested a response by April 26, 2010, and made it clear that if CHAMP did

22  not receive Kelly's "unequivocal acceptance" of all terms set forth in the letter by April 26, 2010, and

23  if Kelly did not take the required steps by that same date, the signatories to the letter would all

24  terminate their association with Kelly and CHAMP concurrent with the expiration of the

25  CHOMP/CHAMP agreement on June 30, 2010.

26          Kelly did not agree to the restorative steps required by the letter of April 16, 2010, nor

27  did he undertake them.  Nagafuji testified that shortly after the letter of April 16, 2010, was delivered

28  to Kelly, Kelly approached him with a copy of the letter, went down the list of demands, and for all

EXHIBIT 1     PAGE 19

EXHIBIT 1:  Page 000012 of 000036

1   but the one concerning scheduling said that they were not open for discussion.  Other than his brief

2   encounter with Dr. Nagafuji, and two contemporaneous but non-responsive letters to Herhusky, Kelly

3   did not respond to the concerns and requirements set forth in Exhibit 57.  Accordingly, on April 29,

4   2010, the signatories to the letter dated April 16, 2010, sent a further letter to Kelly that said that those

5   signatories were giving notice that their professional corporations would not renew their Carmel

6   Healthcare Anesthesia Medical Providers, Inc. Professional Anesthesia Services Agreements. Rather,

7   they would let them expire concurrently with the expiration of the CHOMP/CHAMP contract on June

8   30, 2010.  Exhibit 63.  Shortly thereafter, they began to create Ventana Anesthesia Associates, Inc.

9   ("Ventana")

10          CHOMP was well-aware of the discord at CHAMP, and wanted to protect itself from

11   any adverse consequences that might flow from that discord.  Accordingly, on May 11, 2010, it issued

12   a Request for Proposal seeking proposals by interested parties to enter into an exclusive agreement

13   with CHOMP for the provision to CHOMP of anesthesia services commencing on July 1, 2010. The

14   RFP provided that "[g]iven the short time frame for review of submitted proposals and closing of the

15   contract documents, respondents to the RFP must recognize that CHOMP does not anticipate

16   substantial opportunities to modify or renegotiate the provided contract forms" and that responders

17   "should consider the contract CHOMP's final offer."  Exhibit 92.  The only responding parties were

18   CHAMP and Ventana, and their proposals were very different from one another.  First, Ventana

19   essentially accepted the CHOMP form of contract without change, while CHAMP proposed numerous

20   changes.  Second, the CHAMP proposal would have cost CHOMP by one estimate $500, 000 to

21   1,000,000 more each year than did the CHOMP/CHAMP agreement, and an estimate prepared by

22   Sierra at Kelly's request concluded that CHAMP's proposal would cost CHOMP an additional

23   $1,470,000 more per year.  According to both Chavis and Packer, CHOMP accepted Ventana's

24   proposal over that of CHAMP for at least three reasons; (1) the Ventana proposal was economically

25   superior, (2) CHOMP had doubts that CHAMP could attract sufficient anesthesiologists to perform

26   under the contract, and (3) CHOMP experienced "an erosion of confidence" in Kelly's management

27   skills.  There was also evidence that CHOMP, particularly Chavis and Packer, simply did not trust

28   Kelly.  The CHOMP/CHAMP contract expired on June 30, 2010, and the following day the

EXHIBIT 1:  Page 000013 of 000036

1 | CHOMP/Ventana agreement became effective.

2 |       Kelly did not receive an invitation to join Ventana.  Because the CHOMP/Ventana

3 | contract made Ventana the exclusive provider of anesthesiologists to CHOMP, that lack of an

4 | invitation meant that Kelly could no longer work at CHOMP.

5 |       Because of an anomaly in the CHOMP/CHAMP contract, following the expiration of

6 | that contract CHOMP had no legal right to the moneys received by CHAMP in its collection of

7 | invoices after June 30, 2016 – the "trailing receivables" – even though CHOMP effectively had

8 | advanced that money for the payment of the CHAMP anesthesiologists.  That left CHAMP with a

9 | substantial windfall.  Kelly, as the sole officer, director and shareholder of CHAMP, kept that windfall

10 | in CHAMP, except for a single distribution to the former CHAMP anesthesiologists in September of

11 | 2010.  The money was used to pay Kelly a stipend of $8,000 per month from July 1, 2010, until

12 | December 5, 2012, for his management of CHAMP, and to fund Kelly's attorney's fees for defending

13 | the claims asserted against him in the instant litigation and prosecuting the Cross-Complaint.

14 |

15 |       **LEGAL ANALYSIS**

16 |

17 | **A. The Trailing Receivables Windfall**

18 |       At the heart of the legal issues raised in this case is the question of who is entitled to

19 | the trailing receivables.  Plaintiffs urge that those receivables were the result of services that they

20 | performed and therefore that they should receive them.  Kelly urges that Plaintiffs were paid the

21 | appropriate amounts for their services pursuant to their Professional Anesthesia Services ("PSA")

22 | agreements, and that they are not entitled to any further compensation.  Although not explicitly stated,

23 | Kelly's argument appears to be that the trailing receivables belong to CHAMP, that he is the sole

24 | shareholder of CHAMP and therefore its owner, and that he alone should control those receivables.

25 | To resolve that dispute it is necessary to interpret the intent of the parties when they entered into the

26 | PSA agreements and where possible to give effect to that intent.  Exhibits 19-28.

27 |       The rules governing the interpretation of contracts are not really subject to meaningful

28 | dispute.  "The fundamental goal of contractual interpretation is to give effect to the mutual intention

EXHIBIT 1    PAGE 21

of the parties." *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, (1998) 68 Cal. App. 4th 445, 474. "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent acts and conduct of the parties." *Ibid.* (Citations omitted). "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." *Mitchel v. Brown, supra*, 43 Cal.App.2d at 221; Civil Code § 1638. *See, also*, Civil Code § 1639 ("[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this title)." "Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms." *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-26.

Paragraph 5(a) of each PSA provides that the compensation to an anesthesiologist's professional corporation "shall be as set forth in Exhibit A" to the PSA. That Exhibit A provides that the medical corporations shall be compensated on the basis of the 'units' performed by the anesthesiologist, less the individual's medical corporation's share of CHAMP's costs of doing business. Nothing in any PSA states, or even suggests, what should be done in an uncontemplated circumstance such as the trailing receivable windfall. Nor is the CHOMP/CHAMP agreement of any use in that regard. Accordingly, one must turn to such extrinsic evidence as the pre-signing discussions of the parties, what they were trying to accomplish, and their post-signing conduct.

In CHAMP's 2007 proposal to CHOMP that led to the CHOMP/CHAMP agreement, Kelly wrote that CHAMP "will simply act as a legal conduit for the payment of anesthesiologists without any substantial assets of its own." Exhibit 17. That is what he said to the other CHAMP anesthesiologists when he solicited their support for his proposal. That is what he told Angie Inlow and the other members of the FC. That is what he told Dr. Bailey when she was being recruited. His insistence that the CHAMP stock be owned by a "friendly physician" only makes sense, if at all, in a system in which CHAMP earns no profit and in which the CHAMP stock will never have value. If it may have value at some point, why would the anesthesiologists at CHAMP give that value to a person

EXHIBIT 1:  Page 000015 of 000036

1  unconnected to CHAMP?  The evidence is clear that the parties did not intend that any funds received

2  by CHAMP would go to the shareholder(s) qua shareholders, but rather were to go to the

3  anesthesiologists' medical corporations based on the anesthesiologists' productivity.  The "goal is to

4  push down revenue and expenses to the PC level."  Exhibit 31.  And that is how CHAMP operated

5  until the expiration of the CHOMP/CHAMP contract; any money left over after all bills were paid

6  went to the anesthesiologists' professional corporations on a periodic basis as a "bonus," with the

7  amount allocated to each anesthesiologist based on his or her productivity.  The conclusion that

8  CHAMP was never intended to garner a profit is also supported by the fact that no documents imply

9  much less direct how any profits are to be distributed, or to whom.

10         When CHAMP received the trailing receivables, and did not have to remit them to

11  CHOMP, it experienced a windfall in the neighborhood of $1 million.  That windfall apparently

12  changed Kelly's view of the nature of CHAMP.  Despite the facts set forth in the preceding paragraph,

13  Kelly testified late on the final day of the arbitration hearing, as he apparently did at his deposition,

14  that CHAMP was always intended to be a for-profit enterprise, not a "pass-through" entity or some

15  form of conduit for the flow of funds between CHOMP and CHAMP.  And he appears to take the

16  position in this proceeding that as the sole shareholder of CHAMP he alone is the beneficiary of this

17  windfall, and that under the terms of the individual PSAs the other anesthesiologists have no legal

18  right to any portion thereof.  He argues that under the terms of the integrated PSAs the other

19  anesthesiologists are only entitled to the prescribed payment for the units they performed, that they

20  were so compensated in full and that when CHAMP effectively was paid a second time for those same

21  units, only CHAMP and its sole shareholder were entitled to enjoy the fruits of that second payment.

22         Kelly's argument based on the integrated PSA's misses the point.  The real issue is

23  who is entitled to the benefit, if any, of the ownership of stock in CHAMP?  The parties never agreed

24  that Kelly was entitled to be the sole owner of the stock.  Kelly himself has said repeatedly that he

25  only issued the stock to himself so that CHAMP would be fully-formed when the CHOMP/CHAMP

26  contract was executed, that he did not want to own the stock, and that it would be transferred to

27  someone else once the parties agreed on one or more appropriate transferees.  Until such transfer

28  occurred, Kelly effectively "owned" the stock not for his own benefit but in trust for the group of

EXHIBIT 1     PAGE 23

EXHIBIT 1:  Page 000016 of 000036

1   anesthesiologists who founded CHAMP or who thereafter joined CHAMP and gained the right

2   receive shares in the corporation.  And although Kelly denies that he did so, several of the

3   anesthesiologists and Maury Parrish testified without equivocation that at a meeting of the

4   anesthesiologists on September 20, 2007, Kelly presented a power point slide prepared by Parrish that

5   said that the "founding shareholders" of CHAMP – Drs. Brinks, Hanel, Herhusky, Kelly, Lochridge,

6   Scannell, Scherling and Stackpole – initially would receive 100 shares each for the nominal purchase

7   price of $50.  Exhibit 44.  And several of the anesthesiologists, including Drs. Hanel, Rychkov and

8   Scherling, testified that the promise of being shareholders of CHAMP – Drs. Hanel and Scherling

9   immediately and Dr. Rychkov after he worked at CHAMP for a longer period of time – was central to

10  their decisions to sign their PSAs with CHAMP.  Under the circumstances, Kelly is estopped from

11  maintaining that he alone owns the stock of CHAMP, and that he alone is entitled to benefit by the

12  trailing receivable windfall.

13         On the basis of the record, including the facts reviewed above, the Arbitrator finds that

14  it was the intent of the parties to the PSA agreements that any funds received by CHAMP beyond its

15  expenses were to be distributed to the "founding shareholders" and to others who later might become

16  entitled to shares, allocated on the basis of productivity.  That conclusion is not in conflict with the

17  express terms of the PSA agreements.  That was how excess funds held by CHAMP were treated

18  before the trailing receivables windfall.  Accordingly, Kelly held and holds the CHAMP stock in trust

19  for the benefit of all of the CHAMP anesthesiologists.  The plaintiff medical corporations are entitled

20  to receive their shares of the trailing receivables, calculated on the basis of their respective

21  productivity and reduced by the expenses of collecting them.

22  **B. The Third Amended Complaint**

23              **1.      First Cause of Action – Breach of Fiduciary Duty**

24         Plaintiffs allege that they were owed a fiduciary duty by both Kelly and CHAMP, and

25  that such duty was breached when Kelly and CHAMP kept all of the trailing receivables.  Kelly

26  acknowledged during his testimony that as an officer and director of CHAMP he owed the entity a

27  fiduciary duty.  He also acknowledged that he was and is "a fiduciary in handling CHAMP funds."

28  Nor can there be any real dispute that CHAMP owed a fiduciary duty to the plaintiff medical

EXHIBIT 1     PAGE 24

EXHIBIT 1:  Page 000017 of 000036

1    corporations with respect to its handling of funds received from CHOMP for those corporations and

2    with its collection of funds from insurers and others on behalf of those corporations and the payment

3    of those funds to CHOMP.  As the sole officer and director of CHAMP, and as its soul decision-

4    maker, Kelly owed the plaintiff medical corporations the very same fiduciary duty.

5              Plaintiff medical corporations assert that CHAMP and Kelly breached their fiduciary

6    duty to them in their treatment of the stock and the trailing receivables.  Those funds, they say, were

7    the results of their work and should have been paid to them, rather than to Kelly for running what little

8    was left of CHAMP and to Kelly's lawyers for defending the claims against Defendants and

9    prosecuting the cross-claims. They also assert that Kelly held the shares of CHAMP in trust for them

10   as well as himself, and that he breached his obligations as a fiduciary by keeping all of the shares, by

11   contending that he is the true owner of those shares, and by his position that such ownership allows

12   him to control and maintain the trailing receivables by using them as he has.

13             The Arbitrator finds that the original intent of the parties was that CHAMP was not to

14   make a profit or own assets.  Rather, it was to be a convenient conduit through which the individual

15   medical corporations received payment from CHOMP and effected reimbursements to CHOMP as

16   provided in the CHOMP/CHAMP agreement. CHAMP's conduct after the PSA agreements were

17   signed – the "bonus" system – strongly supports this conclusion.  Because that was the original intent,

18   CHAMP and Kelly breached their fiduciary duty to the plaintiff medical corporations by keeping the

19   trailing receivables and paying them to Kelly for running an effectively defunct entity, and by paying

20   for attorneys to represent Kelly in this litigation.[2] *Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal. 3d

21   93. Accordingly, CHAMP and Kelly are liable to the plaintiff medical corporations for breach of

22   fiduciary duty in the amounts set forth herein.

23

24

25   _____

26   [2]  If Kelly's true intent upon issuing to himself all of the CHAMP stock was to keep ownership of
     that stock to give himself perpetual and complete control of CHAMP, his repeated expressions of a
     desire and of an intention to transfer the stock to a "friendly physician," to the members of the
27   executive committee, or to the "founding shareholders," were unquestionably knowing
     misrepresentations.

28

EXHIBIT 1    PAGE 25

EXHIBIT 1:  Page 000018 of 000036

1          **2.**     **Second through Fourth Causes of Action – Fraud and Misrepresentation**

2              Plaintiffs allege in their second through fourth causes of action that Kelly intentionally

3 made material misrepresentations of fact, or willfully suppressed material facts, concerning CHAMP's

4 stock ownership, governance and finances, with the intent of inducing Plaintiffs to join CHAMP.

5 There is little doubt that Kelly suppressed information that should have been disclosed – examples

6 include the fact that he never appointed Herhusky and Scannell to the board of directors, never

7 established an executive committee, never appointed Herhusky and Scannell as officers of the

8 corporation, and never disclosed to Herhusky or Scannell his continued pursuit of a contract with

9 Sequoia – and there is sufficient evidence to find that he misrepresented material facts – such as his

10 representation that he would transfer stock to one or more transferees.

11              However, to prevail on any of these causes of action Plaintiffs must establish that they

12 suffered monetary damages as a proximate consequence of the asserted fraudulent conduct.  The only

13 alleged consequence of any claimed fraud was that the professional corporations were induced to join

14 CHAMP. See, Third Amended Complaint at ¶¶ 52, 65. But in doing so they suffered no monetary

15 damages.  Rather, they were to be paid for the work they did in accordance with Exhibit A to the

16 PSAs.  They were paid exactly what they agreed to accept.  The fact that they may also share in the

17 trailing receivables windfall is hardly an element of damages suffered as a proximate consequence of

18 any alleged fraud.

19          **3.**     **Fifth and Sixth Causes of Action – Accounting and Declaratory Relief**

20              At the commencement of this action claims for an accounting and for declaratory relief

21 were appropriate, perhaps necessary.  Plaintiffs established their right to such an accounting, but at

22 this point – after years of discovery involving the exchange of thousands and thousands of pages of

23 accounting and financial data, that accounting is no longer required, or even useful.  Nor is declaratory

24 relief now necessary or appropriate.  The dispute, over the years, has evolved effectively into the

25 answer to one question – which parties are entitled to the trailing receivables?  The Arbitrator

26 therefore exercises his discretion pursuant to Code of Civil Procedure § 1061 to deny that requested

27 form of relief.

28

EXHIBIT 1    PAGE 26

**4.      Seventh Cause of Action for Breach of Contract.**

There is no dispute that plaintiff medical corporations, other than those of Scannell and Hanel, and CHAMP entered into binding and enforceable written contracts pursuant to which CHAMP held, and at appropriate times disbursed, funds flowing to those medical corporations from CHOMP or funds received for physician services that were owed to CHOMP in repayment of its advances to CHAMP.  For three full years Scannell, Hanel and CHAMP all acted exactly as if the written agreements executed by the other plaintiff medical corporations had been executed between them as well.  In light of the determination, above, that the trailing receivables belonged to the CHAMP anesthesiologists' medical corporations, and not to the "sole shareholder" of CHAMP, CHAMP's failure to remit the appropriate amounts to the appropriate recipients constituted a breach of contract.  Accordingly, CHAMP is liable to the plaintiff medical corporations in the amounts specified hereafter.

**5.      Eighth Cause of Action for Conversion**

"'The tort of conversion has been defined as follows: "Conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein. It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use." (*Igauye v. Howard* (1952) 114 Cal.App.2d 122, 126 [249 P.2d 558].)'" *Messerall v. Fulwider* (1988) 199 Cal. App. 3d 1324, 1329.

Following the June 30, 2010, expiration of the CHOMP/CHAMP agreement, CHAMP continued to collect, and retained, the trailing receivables.  Based on the determination that the trailing receivables belonged to the CHAMP anesthesiologists' medical corporations, CHAMP's retention of them – as directed solely by Kelly – was wrongful, and constituted conversion.  Accordingly, CHAMP and Kelly are liable to the plaintiff medical corporations in the amounts specified hereafter.

**C. Second Amended Cross-Complaint**

**1.      First Through Third Causes of Action for Interference**

Kelly and Champ each asserts a claim for intentional interference with the CHOMP/CHAMP contract.  To prevail on such a claim, a plaintiff must prove (1) a valid contract

EXHIBIT 1     PAGE 27

EXHIBIT 1:  Page 000020 of 000036

1  between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's

2  intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual

3  breach or disruption of the contractual relationship; and (5) resulting damage. *Seaman's Direct*

4  *Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 765-766; *Ramona Manor*

5  *Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1130.)." *Pacific Gas &*

6  *Electric Co. v. Bear Stearns & Co.*, (1990) 50 Cal.3d 1118, 1126.  Kelly's claim founders on the

7  reality that he was not a party to that contract.  CHAMP's claim founders on the reality that there was

8  no "breach or disruption of the contractual relationship."  Rather, the contract expired by it terms.  This

9  claim accordingly fails.

10  　　　　Kelly and CHAMP each asserts a claim of intentional interference with prospective

11  economic advantage.  "The tort of interference with prospective economic advantage protects the

12  same interest in stable economic relationships as does the tort of interference with contract, though

13  interference with prospective advantage does not require proof of a legally binding contract." *Ibid.*,

14  (Citation omitted).  "The chief practical distinction between interference with contract and

15  interference with prospective economic advantage is that a broader range of privilege to interfere is

16  recognized when the relationship or economic advantage interfered with is only prospective." *Ibid.*,

17  (Citation omitted).  A "plaintiff seeking to recover damages for interference with prospective

18  economic advantage must plead and prove as part of its case-in-chief that the defendants conduct was

19  wrongful by some legal measure other than the fact of interference itself." *Korea Supply Co. v.*

20  *Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153, citing *Della Penna v. Toyota Motor Sales,*

21  *U.S.A., Inc.* (1995) 11 Cal.4th 376.  But Kelly personally had no prospective economic relationship

22  with CHOMP, and thus no viable claim that Cross-Defendants wrongly interfered with it.

23  　　　　CHAMP had such a prospective relationship with CHOMP, but the evidence was clear

24  that any such relationship was destroyed not by any alleged "wrongful" acts of Cross-Defendants but

25  by Kelly himself.  His relentless efforts to arrange a contractual relationship between CHAMP and

26  Sequoia Hospital when told clearly that neither CHAMP nor CHOMP wanted there to be any such

27  relationship, his recalcitrant behavior regarding the hiring of Matthew Fritch, and his long-term but

28  un-kept promise to transfer shares in CHAMP strained his relationship with CHOMP management

EXHIBIT 1     PAGE 28

EXHIBIT 1:  Page 000021 of 000036

1  and with his CHAMP colleagues, to the point where neither group trusted him.  Moreover, the

2  response he prepared on behalf of CHAMP to CHOMP's RFP was rejected by CHOMP because, *inter*

3  *alia*, it ignored the warning in the RFP that contract terms would not be negotiated, it raised the cost to

4  be borne by CHOMP by millions of dollars, and CHOMP officials doubted Kelly's ability to lead.

5        Kelly and CHAMP each asserts a claim for negligent interference with prospective

6  economic relations.  The requirements to succeed in such a claim are similar to those governing a

7  claim for intentional interference, but substitutes knowledge that a relationship will be damaged by

8  failure to use due care for intent. *North American Chemical Co. v. Superior Court* (1997) 59

9  Cal.App.4th 754, 786.  Again, Kelly had no prospective economic relationship with CHOMP.  And

10  CHAMP's prospective relationship was damaged or destroyed by Kelly, not by Cross-Defendants.

11     **2.**    **Fourth and Fifth Causes of Action for Defamation and Trade Libel**

12        "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or

13  other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or

14  obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his

15  occupation."  Civil Code § 45.  "The tort of defamation 'involves (a) a publication that is (b) false, (c)

16  defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special

17  damage.' (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 529, p. 782, citing Civ. Code, §§

18  45–46 and cases.)" *Taus v. Loftus* (2007) 40 Cal.4th 683, 720.  "The general rule for defamation is

19  that only one 'who takes a *responsible* part in the publication is liable for the defamation.' (*Osmond v.*

20  *EWAP, Inc.* (1984) 153 Cal.App.3d 842, 852 [200 Cal. Rptr. 674], italics in original; *Jones v. Calder*

21  (1982) 138 Cal.App.3d 128, 134 [187 Cal. Rptr. 825].)" *Matson v. Dvorak* (1995) 40 Cal.App.4th

22  539, 549. *See, also, Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688.

23        The defamation claim set forth in the operative pleading is based on the allegation that

24  "CROSS-COMPLAINANTS are informed and believe and/or believe that SCANNELL and/or

25  HERHUSKY falsely represented to executives at THE HOSPITAL that KELLY and/or CHAMP was

26  failing to provide adequate coverage for the patients under their care." SACC, ¶ 171.[3] *See, also,*

27

28  [3]  The Fifth Cause of Action, for trade libel, relies on the same allegation. SACC, ¶ 177.

EXHIBIT 1:  Page 000022 of 000036

1   SACC ¶ 116.  As the evidence presented at the arbitration hearing makes clear, the referenced

2   "coverage" concerned the contention that Kelly was taking cases at Sequoia Hospital in Redwood City

3   while on call to cover cases at CHOMP.  Scannell and Herhusky testified under oath that they made

4   no such statement to anyone in the administration of CHOMP.  Dr. Stephen Packer testified in his

5   deposition that was used in lieu of live appearance that he did not believe that he heard the

6   information about Dr. Kelly taking cases at Sequoia from either Scannell or  Herhusky, but rather

7   from Glenna Vaskelis, the CEO at Sequoia.

8          Dr. Anthony Chavis, the other member of CHOMP's administration with whom

9   Scannell and Herhusky dealt, testified that he was first informed that Dr. Kelly was on occasion

10  unable to fulfill his on-call duties without being excused by the hospital by Tom Housen, director of

11  the main operating room.  Mr. Housen did not say that Dr. Kelly had missed a call, only that he was

12  handling cases at Sequoia Hospital in Redwood City while on call at CHOMP.  Glenna Vaskelis, the

13  CEO at Sequoia Hospital, confirmed that Dr. Kelly was handling cases there.  Both Packer and Chavis

14  denied having heard such statement made by either Scannell or Herhusky, or indeed by anyone else at

15  CHAMP.  There was no evidence supporting the allegation that either Scannell or. Herhusky ever

16  made such a statement to anyone at CHOMP.

17         During the arbitration hearing, Kelly took the position that the statements made about

18  him in the letters dated April 16, 2010, and April 29, 2010, Exhibits 57 and 63, were false and

19  defamatory, and had been published to CHOMP by the Cross-Defendants.  By contrast, the Arbitrator

20  finds that each of the challenged statements was completely or substantially[4] true.

21  Those statements were:

22

23  _____

24  [4] "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the
    libelous charge be justified.' [Citations.]  Put another way, the statement is not considered false unless
25  it 'would have a different effect on the mind of the reader from that which the pleaded truth would
    have produced.' [Citations.]" (*Masson v. New Yorker Magazine* (1991) 501 U.S. 496, 516–517.)"
26  *Hughes v. Hughes* (2004) 122 Cal.App.4th 931.

27

28

EXHIBIT 1:  Page 000023 of 000036

1          1.      That Kelly was not devoting sufficient time to building the cardiac program at

2  CHOMP – a CHOMP priority – but was instead secretively spending his time and efforts on trying to

3  achieve a contract with Sequoia, a contract that was opposed by CHOMP and by nearly all of the

4  members of CHAMP – and that such conduct was detrimental to CHAMP's efforts to renew the

5  CHOMP/CHAMP agreement.  Packer's letter of March 11, 2010, said clearly that Kelly's conduct put

6  the renewal of the CHOMP/CHAMP contract in "serious jeopardy."  Kelly's own testimony and that

7  of Angie Inlow confirm Kelly's goal and the amount of time and energy he spent pursuing it.  Exhibits

8  50-54, 56 and 62 document some of those efforts.  Exhibit 49 and Packer's testimony establish that

9  CHOMP had no interest in any arrangement with Sequoia, and the testimony of Herhusky, Dr. Bailey

10  and other CHAMP anesthesiologists support the conclusion that the anesthesiologists at CHAMP

11  likewise had no such interest. Exhibit 49, and the testimony of Packer, Chavis, Herhusky and

12  Scannell, establish that CHOMP considered those efforts as a negative in connection with contract

13  renewal discussions.

14          2.      That in the nearly three years of CHAMP's existence, the shares of stock

15  remained 100% in Kelly's name; he had promised repeatedly to transfer them as directed, but never

16  did so.  Kelly offered excuses as to why such transfer never occurred, but cannot challenge the fact

17  that it did not happen.

18          3.      That Kelly ran CHAMP and made decisions for it without the knowledge, much

19  less the consent, of the other two members of the Executive Committee.  Examples include his refusal

20  to transfer shares, his refusal to share financial information with his colleagues and his negotiations

21  with Sequoia after the Executive Committee said it did not wish to pursue any such agreement.

22          4.      That Kelly overruled the decisions of the Executive Committee when he did not

23  like them, and did as he wished.  Examples include his offer of a job to applicant Samantha Hanson

24  when the other members of the Executive Committee agreed that someone else was the better

25  candidate, and his refusal to transfer shares to Dr. Scherling after the FC, which included Herhusky

26  and Scannell, decided to do so.

27          5.      That his treatment of Fritch's application ran the risk of losing Fritch, and

28  alienated CHOMP leadership.  There is no question that Kelly dragged his feet in moving Fritch's

EXHIBIT 1    PAGE 31

EXHIBIT 1:  Page 000024 of 000036

1   application along, that his delays nearly pushed Fritch to other employment or that CHOMP was

2   displeased.  Exhibit 49.

3          6.     That CHAMP members could get no financial information about their

4   company.  CHAMP's CPA confirmed that from "day one" he was told by Kelly not to release

5   financial information to anyone without Kelly's approval.

6          7.     That Kelly "influenced the call schedule and room assignments to suit [his]

7   own desires while creating animosity in [the] group."  Several CHAMP anesthesiologists testified that

8   they noted irregularities in the scheduling process, all to the benefit of Kelly, and that they complained

9   to Herhusky and Scannel about their observations.  The existence of animosity is undisputed.

10         8.     That Kelly was "not adequately available for cardiac call, leaving other

11  anesthesiologists to cover cardiac emergencies for which [Kelly] received a call stipend" and that

12  Kelly has "on multiple instances been unavailable for general OR call without arranging replacement

13  coverage."  Drs. Herhusky, Scannell and Hanel all testified that they were called upon on one or more

14  occasions to take cases for which Kelly was responsible but for which he did not respond to a call.

15         9.     That Kelly has not maintained his privileges with MPSC.  This statement is

16  substantially accurate; he was given "courtesy" privileges but did not qualify for privileges because he

17  handled no cases at MPSC.  Moreover, he would lose those courtesy privileges unless he performed a

18  dozen cases at MPSC.  Defendants' Exhibit 51.  Moreover, the statement is not defamatory.

19         10.    That Kelly "alienat[ed] the administrators at both CHOMP and the Monterey

20  Peninsula Surgical Center thereby putting those contracts at risk."  The testimony of Drs. Chavis and

21  Packer, and that of Thomas Wilson, make clear that such alienation did occur, and that it put the

22  CHOMP/CHAMP contract and the CHAMP/MPSC contract at risk.

23         11.    That there has been a continuing lack of cooperation and transparency on

24  Kelly's part.  Kelly's instructions to Robert Bianchi to keep CHAMP financial information

25  confidential from the CHAMP anesthesiologists, his failure or refusal to transfer stock, his actions

26  with respect to Fritch, and his suppression of his efforts to arrive at a contract with Sequoia all support

27  the truth of charge.

28         12.    That Kelly shouted at Scannell in a public hallway and that he approached Dr.

EXHIBIT 1     PAGE 32

EXHIBIT 1:  Page 000025 of 000036

1   Hanel to threaten him while the latter was involved in patient care.  The testimony of Drs. Scannell

2   and Hanel was more credible than were Kelly's versions of those events.

3

4          The evidence presented at the hearing satisfied the Arbitrator that each challenged

5   statement was true, either literally or substantially, and that the factual accuracy of all of these

6   statements dooms the claim of defamation.  To conclude otherwise a factfinder would have to decide

7   that Kelly was more credible than were the other witnesses.  Simply put, he was not.

8          Moreover, in order for Kelly to impose liability on any of the Cross-Defendants for any

9   asserted defamatory publication about him, he must establish not only that a defamatory statement

10  was published but that the particular Cross-Defendant was substantially involved in that publication.

11  Kelly here lacks evidence that any alleged statement was published by any Cross-Defendant.  He can

12  raise an inference to this effect, but such an inference is insufficient to meet his burden of proof.

13         Kelly failed to meet his burden of proof that any named Cross-Defendant published or

14  participated in the publication of any negative statement about him.  Accordingly, the claim fails..

15         Kelly and CHAMP assert a claim of trade libel against the Cross-Defendants based on

16  their allegation (Paragraph 177 of their Second Amended Cross-Complaint) that Scannell and/or.

17  Herhusky "falsely represented orally to executives at [CHOMP] that KELLY and/or CHAMP was

18  failing to provide adequate coverage for patients under their care."

19         "The tort encompasses 'all false statements concerning the quality of services or

20  product of a business which are intended to cause that business financial harm and in fact do so."

21  *ComputerXpress, Inc. v. Jackson* (2001)  93 Cal.App.4th 993, 1010, citing *Leonardini v. Shell Oil Co.*

22  (1989) 216 Cal.App.3d 547, 572.  Like defamation, such a claim requires proof of the publication by

23  defendant of a false statement of fact.  And like Kelly's defamation claim, it fails for lack of

24  admissible evidence of any such false publication by any of the Cross-Defendants.

25     **3.    Sixth Cause of Action for Breach of Fiduciary Duty**

26         CHAMP and Kelly posit a claim for breach of fiduciary duty on the assertion that

27  because Herhusky and Scannell were officers of CHAMP, they owed it a fiduciary duty that they

28  breached by organizing Ventana to compete with CHAMP for, *inter alia*, the contract with CHOMP.

EXHIBIT 1    PAGE 33

EXHIBIT 1:  Page 000026 of 000036

1  The claim against the remaining Cross-Defendants rests essentially on the contention that they aided

2  and abetted the alleged breaches by Herhusky and Scannell.

3    In Paragraph 184 and 185 of their Second Amended Complaint, Cross-Complainants

4  allege that Herhusky and Kelly were officers of CHAMP, and members of its Executive Committee.

5  In Paragraph 186, CHAMP contends that Herhusky and Scannell owed CHAMP a fiduciary duty

6  "[b]y virtue of their relationship with CHAMP." The starting point for analysis is that "relationship."

7    The law is well-established that an officer or managerial employee owes his or her

8  employer a fiduciary duty. *See, e.g., GAB Bus. Servs. v. Lindsey & Newsom Claim Servs.* (2000) 83

9  Cal.App.4th 409, 421. A threshold question here is whether Scannell or Herhusky were officers or

10  managerial employees when they undertook their efforts to create a separate entity to compete with

11  CHAMP for the CHOMP contract.

12    The record is clear that neither Herhusky nor Scannell was ever an employee of

13  CHAMP. Rather, their separate medical corporations each had a contract with CHAMP and those

14  contracts made clear that the relationship was one of independent contract. Scannell and Herhusky

15  were never paid by CHAMP as employees; rather, their medical corporations received payment for

16  units assigned to those corporations in compensation for their administrative efforts. Everyone agreed

17  that they would be officers and directors, but Kelly never appointed either to the board or to any

18  office, and never took any other step that would have created a fiduciary duty on their part in favor of

19  CHAMP.[5] A strong argument can be made that Kelly should be estopped by his conduct from

20  contending that Herhusky and Scannell were officers or directors of CHAMP, or that they were

21  members of its theoretical executive committee.

22    Cross-Complainants, however, also contend that Herhusky and Scannell were agents of

23  CHAMP, and therefore that they owed it a duty of loyalty. "The duty arises not from a contract but

24  from a relationship – here the relationship of principal and agent." *Huong Que, Inc. v. Luu* (2007) 150

25  Cal.App.4th 400, 410. "Agency is the fiduciary relationship that arises when one person (a 'principal')

26

27  [5] Even though he did not appoint them to the CHAMP Executive Committee, he on May 27, 2010,

28  removed them from that body retroactive to April 16, 2010.

EXHIBIT 1:  Page 000027 of 000036

1  manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and

2  subject to the principal's control, and the agent manifests assent or otherwise consents to so act."

3  *Ibid.* "[O]ne becomes an agent, and thereby assumes a duty of loyalty, by acting or assenting to act

4  for another – even if no consideration is furnished and no contract is formed." *Id.* at 415. Herhusky

5  and Scannell assented to act as, and did act as, agents of CHAMP, and therefore owed it a fiduciary

6  duty. There is, however, no basis to argue that they owed such a duty to Kelly or his medical

7  corporation.

8          It is well-settled that in "the absence of an agreement to the contrary – and there is no

9  evidence of any contractual limitations binding on these defendants – an agent is free to engage in

10  competition with his principal after termination of his employment." *Sequoia Vacuum Systems v.*

11  *Stransky* (1964) 229 Cal.App.2d 281, 287. "Furthermore, he may plan and develop his competitive

12  enterprise during the course of his agency provided the particular activity engaged in is not against the

13  best interests of his principal. . . . Protection of the principal's interest requires a full disclosure of acts

14  undertaken in preparation for entering into competition. . . ." *Ibid.*, citing *Daniel Orifice Fitting Co.*

15  *v. Whalen* (1962) 198 Cal. App. 2d 791.

16          The acts of Cross-Defendants in preparing and sending their letter of April 16, 2010, to

17  Kelly – Exhibit 57 – breached no fiduciary duty to CHAMP. Those acts were not designed to damage

18  CHAMP; to the contrary, they constituted an effort at saving CHAMP from self-destructing because

19  of the differences between Kelly on the one hand and the other CHAMP anesthesiologists on the

20  other. Each individual Cross-Defendant had concluded that Kelly's conduct as described in Exhibit

21  57 was unacceptable, and that if Kelly did not change his conduct each Cross-Defendant medical

22  corporation would allow its PSA with CHAMP to expire by its terms on June 30, 2010. The PSA

23  agreements expressly permitted that. *See, e.g,* Exhibit 24 at paragraph 4(b). Cross-Defendants as a

24  group told Kelly of their concerns and what he needed to do to assuage those concerns. And they told

25  Kelly that they would let those PSA contracts expire if he did not take the specific corrective actions

26  set forth in that letter. They gave Kelly a chance to continue the contractual relationships. Kelly

27  declined to take advantage of that offer.

28          Cross-Complainants argue strongly that the April 29, 2010, action by the CHAMP

EXHIBIT 1     PAGE 35

EXHIBIT 1:  Page 000028 of 000036

1 | Executive Committee releasing all parties from the limitations of the anti-competition and anti-
2 | solicitation provisions of the PSA agreements was a breach of fiduciary duty because it was not in the
3 | best interests of CHAMP.  Cross-Defendants in turn urge that the non-compete and non-solicitation
4 | provisions contained in Paragraph 11 of the PSA agreements are made void and unenforceable by the
5 | provisions of Business & Professions Code §16600 ("[e]xcept as provided in this chapter, every
6 | contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any
7 | kind is to that extent void.")

8 |         Under the provisions of Paragraph 11, "[d]uring the term of this Agreement and for a
9 | period of six (6) months thereafter, Physician Corporation and Physician shall not, without the prior
10 | written consent of the CHAMP Executive Committee, provide anesthesia services in any other
11 | hospital or ambulatory surgery center that is located within CHOMP's Primary service area as defined
12 | in the CHOMP Exclusive Agreement."  Under that same paragraph, "[t]hroughout the term of this
13 | Agreement and for a period of two (2) years thereafter, Physician Corporation and Physician will not,
14 | without the prior written consent of the CHAMP Executive Committee, "solicit . . . or accept any
15 | competitive business from any person or entity that has been solicited by or transacted business with
16 | CHAMP . . ."

17 |         In *Edwards v. Arthur Anderson, LLP* (2008) 44 Cal.4th 937, the employment agreement
18 | between an accounting firm and its employees provided that "[i]f you leave the Firm, for eighteen
19 | months after release or resignation, you agree not to perform professional services of the type you
20 | provided for any client on which you worked during the eighteen months prior to release or
21 | resignation."  And it provided that "[f]or twelve months after you leave the Firm, you agree not to
22 | solicit (to perform professional services of the type you provided) any client of the office(s) to which
23 | you were assigned during the eighteen months preceding release or resignation.  The California
24 | Supreme Court had little difficulty in voiding those provisions as inconsistent with Business &
25 | Professions Code §16600 and with California's "settled legislative policy in favor of open competition
26 | and employee mobility."  *Id.* at 945.  Comparing the provisions of the PSA with the provisions that
27 | were struck down in *Edwards* leads clearly to the conclusion that the PSA provisions at issue here are
28 | rendered void and unenforceable by the provisions of Business & Professions Code §16600.

EXHIBIT 1    PAGE 36

1   Accordingly, the abrogation of those restrictions does not constitute a breach of a fiduciary duty.

2             This is not a classic breach of loyalty case in which one or more officers or managers,

3   without notice to the employer, abscond together with several employees and a raft of trade secret

4   information. *See, e.g., GAB Bus. Servs. v. Lindsey & Newsom Claim Servs., supra,* 83 Cal.App.4th at

5   414-15; *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, 347-48. Nobody set out to steal

6   CHAMP's business or to harm CHAMP. The evidence was convincing that if Kelly had agreed to the

7   requirements set forth in Exhibit 57, the notice of intention to let the PSA contracts expire would have

8   been withdrawn and CHAMP would have gone forward as then constituted. Had that happened, the

9   chance that CHAMP would receive the contract renewal that it wanted from CHOMP would have

10   been greatly improved. Kelly was given a choice, and he made his decision. CHAMP can hardly

11   blame the Cross-Defendants for the decision Kelly made.

12         **4.**     **Seventh and Eighth Causes of Action - Interference - Sequoia Relationship**

13             Kelly and CHAMP accuse Cross-Defendants of interfering, intentionally and

14   negligently, with their prospective relationships with Sequoia. The Arbitrator cannot find any

15   evidence that Kelly and/or CHAMP had a prospective relationship with Sierra, much less any

16   evidence of any conduct that could have interfered with that prospective relationship. Kelly's

17   attempts to create one angered his fellow anesthesiologists and CHOMP officials, but neither

18   Herhusky nor Scannell took any steps to interfere with whatever relationship Kelly or CHAMP might

19   have had with Sequoia.

20         **5.**     **Ninth Cause of Action – Unfair Competition**

21             Kelly and CHAMP offer no specific testimony or other evidence, beyond that

22   discussed above, that would explain much less justify a claim that Ventana is guilty of unfair

23   competition. All that Ventana did was respond to the RFP issued by CHOMP.

24         **6.**     **Tenth through Twelfth Causes of Action – Interference**

25             Kelly and CHAMP assert intentional and negligent interference with their contracts

26   with the other CHAMP anesthesiologist, as well as intentional interference with their economic

27   relationships with the other CHAMP anesthesiologists. The analysis above regarding similar claims

28   as to the CHAMP/CHOMP contract applies with equal force here. Kelly was not a party to those

EXHIBIT 1    PAGE 37

EXHIBIT 1:  Page 000030 of 000036

1 contracts, a fact that alone dooms his claims for interference with contract.  Moreover, "[c]onsistent

2 with its underlying policy of protecting the expectations of contracting parties against frustration by

3 outsiders who have no legitimate social or economic interest in the contractual relationship, the tort

4 cause of action for interference with contract does not lie against a party to the contract." *Applied*

5 *Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514.  Each of the PSA agreements

6 was a contract between CHAMP and an anesthesiologist's medical corporation.  Accordingly

7 CHAMP cannot sue the individual medical corporations for interfering with contracts to which

8 CHAMP was a party.  Moreover, the evidence discussed herein supports the conclusion that Kelly had

9 no potential economic relationships with the other CHAMP anesthesiologists.

10          **7.    Thirteenth Cause of Action – Declaratory Relief.**

11          For the reasons set forth above concerning the Arbitrator's exercise of discretion to

12 deny Plaintiffs' declaratory relief claim.  The Arbitrator denies this claim as well.

13          **8.    Fourteenth and Fifteenth Causes of Action – Contract and Fiduciary Duty**

14          These two causes of action are premised on the allegation that on at least one occasion

15 Scannell processed the invoice for a case through a personal billing service, thus denying Kelly and

16 CHAMP any share of that improperly-directed invoice.  First, there was no such evidence presented.

17 Second, had evidence been provided it appears that the amount at issue would have been *de minimus*.

18          **9.    Sixteenth Cause of Action – Ventana's Unjust Enrichment.**

19          The final claim of Kelly and CHAMP is that Ventana has benefited from the claimed

20 wrongful conduct addressed above, and that it should be required to hold those ill-gotten benefits in

21 trust for Kelly and CHOMP.  Because, as the forgoing demonstrates, there was no wrongful conduct

22 this claim has no merit.

23 **D.        Kelly's Claim of Entitlement to Indemnification**

24          Kelly contends that he was and is allowed to use CHAMP funds to indemnify himself

25 for the costs and expenses of defending the claims against him, and to prosecute the claims made in

26 the Cross-Complaint, by virtue of the provisions of Labor Code § 2802 and Corporations Code § 317.

27 As the following makes clear, his is mistaken.

28          "Because the Labor Code does not expressly define 'employee' for purposes of section

EXHIBIT 1    PAGE 38

EXHIBIT 1: Page 000031 of 000036

1  2802, the common law test of employment applies. (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1087

2  [32 Cal. Rptr. 3d 483, 116 P.3d 1162].)  The essence of the test is the 'control of details' – that is,

3  whether the principal has the right to control the manner and means by which the worker

4  accomplishes the work . . ."  *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th

5  1, 10. "The determination (employee or independent contractor) is one of fact . . ."  It is hard to argue

6  here that CHAMP "controlled the manner and means by which" Kelly performed his work.  Quite to

7  the contrary, Kelly had virtually complete control over CHAMP.  Kelly was not an employee of

8  CHAMP[6] and Labor Code § 2802 does not apply here.

9           "Corporations Code section 317 (section 317), subdivision (c), provides in pertinent

10  part that a corporation shall have the power to indemnify any person who was or is a party or is

11  threatened to be made a party to any threatened, pending, or completed action by or in the right of the

12  corporation to procure a judgment in its favor by reason of the fact that the person is or was an agent

13  of the corporation, against expenses actually and reasonably incurred by that person in connection

14  with the defense or settlement of the action if the person acted in good faith, in a manner the person

15  believed to be in the best interests of the corporation and its shareholders." *Wilshire-Doheny*

16  *Associates, Ltd. v. Shapiro* (2000) 83 Cal.App.4th 1380, 1388.

17           "In order for section 317 to apply, the action must have been brought against the

18  indemnitee 'by reason of the fact that the person is or was an agent of the corporation.'" "'In other

19  words, 'the conduct of the agent which gives rise to the claim against him must have been performed

20  in connection with his corporate functions and not with respect to purely personal matters.'" [Citation

21  omitted].  The agent must have been acting to promote the corporate good, not personal profit or

22  interests.  *Id.* at pp. 1123-1124.)

23           "In addition, subdivision (c) of section 317 requires that the agent act 'in good faith, in

24  a manner the person believed to be in the best interests of the corporation and its shareholders.' It

25  allows indemnification of an agent who is negligent or has made a mistake, but not one who has acted

26  in bad faith or is guilty of intentional misconduct." *Ibid.*  The Arbitrator finds that the evidence

27  _____

28  [6]  Nor was he paid as an employee.

1 | reviewed above established that Kelly acted for his own perceived benefit, and not for CHAMP's

2 | benefit, and he was not sued for CHAMP's conduct, but solely for his own efforts to take for himself

3 | what rightfully belonged to others.  The label "bad faith" fairly applies.

4 | "Subdivision (d) of section 317 provides that 'to the extent that an agent of a

5 | corporation has been successful on the merits in defense of any proceeding referred to in subdivision

6 | (b) or (c) or in defense of any claim, issue, or matter therein, the agent shall be indemnified against

7 | expenses actually and reasonably incurred by the agent in connection therewith.'" *Ibid.* The findings

8 | made herein make clear that Kelly was not successful on the merits of the claims and cross-claims.

9 | Subdivision (e)(4) of section 317 provides that, 'except as provided in subdivision (d),

10 | any indemnification under this section shall be made by the corporation only if authorized in the

11 | specific case, upon a determination that indemnification of the agent is proper in the circumstances

12 | because the agent has met the applicable standard of conduct set forth in subdivision (b) or (c) . . .'"

13 | Such determination may be made by, *inter alia* "independent legal counsel in a written opinion. . ."

14 | *Ibid.* Here, Kelly testified that he had received such an opinion, but declined to provide a copy,

15 | resting on his attorney/client privilege.  Accordingly, there was no admissible evidence that

16 | independent counsel opined to him that he was entitled to be indemnified.

17 | "The policy considerations behind section 317 'are that persons who serve the

18 | corporation in good faith should, in the absence of certain conduct (fraud, breach of fiduciary duties,

19 | etc.) be free from liability for corporate acts; indemnification encourages capable persons to perform

20 | their duties, secure in the knowledge that expenses incurred by them despite their honesty and

21 | integrity will be borne by the corporation." *Id.* at 1378-79), citing (*Plate v. Sun-Diamond Growers*

22 | (1990) 225 Cal.App.3d 1115, 1122-1123. Kelly's actions were intended to benefit himself and not

23 | CHAMP or its other anesthesiologists and his breaches of fiduciary duty disqualify him from

24 | receiving indemnity under the statutory scheme.

25 | In addition, Corporations Code § 317(f) provides that "[e]xpenses incurred in

26 | defending any proceeding may be advanced by the corporation prior to the final disposition of the

27 | proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall

28 | be determined ultimately that the agent is not entitled to be indemnified as authorized in this section."

EXHIBIT 1:  Page 000033 of 000036

1 ‖ Kelly acknowledged at the hearing that he did not obtain or provide an undertaking.

2 ‖       Finally, Kelly and CHAMP assert that CHAMP certainly had the right to expend its

3 ‖ assets to defend itself, and to prosecute claims that it asserted in the Second Amended Cross-

4 ‖ Complaint. And technically it did. But CHAMP itself had no stake in the litigation. The fight clearly

5 ‖ was one between Kelly and the other anesthesiologists over the ownership of CHAMP's stock and

6 ‖ thus its profits and assets, including any positive judgment it might receive under the Second

7 ‖ Amended Cross-Complaint. CHAMP was intended to be simply a conduit, and CHAMP's assets

8 ‖ ultimately would go to one or more of the other parties. It was not in CHAMPs best interests to spend

9 ‖ a small fortune waging a war that concerned it only nominally, but that is what it did under Kelly's

10 ‖ leadership. This was was Kelly's fight, not CHAMP's, and Kelly does not have the right to spend

11 ‖ CHAMP's funds to assert and prosecute his own claims.

12 ‖ **E.**      **Damages**

13 ‖       As is set forth above, Plaintiffs suffered damages that are measured by the amount of

14 ‖ money that they would have received had there had been no breach of fiduciary duty, breach of

15 ‖ contract or conversion. They are entitled to recover those amounts from CHAMP, Richard Kelly,

16 ‖ M.D. and Richard Kelly M.D. Inc.

17 ‖       In Exhibit 91, Plaintiffs' accounting expert David Sandys calculated those amounts by

18 ‖ reviewing the books of CHAMP to determine what cash it had in the bank as of June 30, 2010, how

19 ‖ much it collected after June 30, 2010, and how much of its expenditures after June 30, 2010, appeared

20 ‖ to be for the benefit of Kelly, not CHAMP. This latter category included an $8,000 monthly payment

21 ‖ to Kelly, through December 5, 2012, for running what was essentially a defunct business, and

22 ‖ attorneys' fees spent in the instant action. His method was appropriate, and no evidence was offered

23 ‖ to refute any of the accounting work of Mr. Sandys, or the assumptions he made in performing such

24 ‖ work. The Arbitrator therefore adopts the damage analysis of Mr. Sandys as set forth in Exhibit 91.

25 ‖       Under the pre-litigation practice of CHAMP, money in its possession that it did not

26 ‖ need to operate was paid periodically to the CHAMP anesthesiologists by way of a bonus. Here, such

27 ‖ a distribution should have taken place no later than the end of December, 2010. Accordingly, pre-

28 ‖ judgment interest will run from that date.

EXHIBIT 1    PAGE 41

EXHIBIT 1: Page 000034 of 000036

1   　　　　There will be no award of exemplary or punitive damages. There is no need to further

2   punish or make an example of any party. The facts and circumstances described above are sufficient

3   to do so.

4

5   　　　　　　　　　　　**THE ARBITRATION OF PHASE 2**

6

7   　　　　On October 19, 2016, the Arbitrator issued the phase one preliminary award that

8   provided, among other things, that "Plaintiffs shall recover their costs of suit." On November 15,

9   2016, the prevailing parties disclaimed any intention to move for an award of attorney's fees,

10   reserving only the right to seek recoverable costs.[7]

11   　　　　The Arbitrator elected to use the procedure set forth in Rule of Court 3.1700 to address

12   the cost issue. Accordingly, prevailing Plaintiffs and Cross-Defendants submitted their memoranda of

13   costs and disbursements in the amounts of, respectively, $40,480.15 and $85,902.64. On December 9,

14   2016, Defendants/Cross-Complainants timely served and filed a Motion to Tax Costs that challenged

15   $23,115.69 of the recoverable costs sought by Cross-Defendants. On December 19, 2016, Cross-

16   Defendants gave written notice by electronic mail that they would not oppose the Motion to Tax

17   Costs, and that their claims for recoverable costs should be reduced by the challenged $23,115.69 to

18   $62,786.95.

19   　　　　Immediately after Cross-Defendants waived their right to oppose the Motion to Tax

20   Costs, Defendants/Cross-Complainants gave notice by electronic mail that they would file the

21   following day a motion to disallow all costs claimed by Plaintiffs and Cross-Defendants, except for

22   those arising from the fees of the arbitrator, and asked that their motion be set for hearing on January

23   20, 2017. Cross-Defendants provided by email a series of arguments supporting their position that the

24   motion lacked merit. The Arbitrator reviewed the motion, the arguments of Cross-Defendants, the

25   authorities cited by the parties and other authorities and concluded that no hearing was necessary. The

26   Arbitrator so informed the parties and invited them to submit any additional arguments they thought

27   ──────────────────

28   [7] The Preliminary Award did not find any party liable for punitive damages.

EXHIBIT 1    PAGE 42

EXHIBIT 1:  Page 000035 of 000036

1   necessary by 5:00 p.m. on December 30, 2016, at which time the motion would be deemed submitted.

2   On January 2, 2017, the Arbitrator granted the Motion to Tax Costs, denied the Revised and Renewed

3   Motion to Disallow Costs, awarded Plaintiffs $40,480.15 in costs, and awarded Cross-Defendants

4   $62,786.95 in costs.

5

6   **BASED ON THE FOREGOING,** the Arbitrator rules as follows:

7

8         Bridget Bailey-Tregenza, D.O., Inc. shall recover from Carmel Healthcare Anesthesia

9   Medical Providers, Inc., Richard Kelly, M.D., Inc., and Richard Kelly, M.D., the sum of $82,578,

10  together with interest thereon at the rate of seven percent (7%) per annum from and after December

11  31, 2010.

12        Heinrich A. Brinks, M.D., a Professional Corporation., Inc. shall recover from Carmel

13  Healthcare Anesthesia Medical Providers, Inc., Richard Kelly, M.D., Inc., and Richard Kelly, M.D.,

14  the sum of $60,451, together with interest thereon at the rate of seven percent (7%) per annum from

15  and after December 31, 2010.

16        Arno Hanel, M.D., Inc., shall recover from Carmel Healthcare Anesthesia Medical

17  Providers, Inc., Richard Kelly, M.D., Inc., and Richard Kelly, M.D., the sum of $64,450, together

18  with interest thereon at the rate of seven percent (7%) per annum from and after December 31, 2010.

19        Michael J. Herhusky, M.D., Inc., shall recover from Carmel Healthcare Anesthesia

20  Medical Providers, Inc., Richard Kelly, M.D., Inc., and Richard Kelly, M.D., the sum of $91,520,

21  together with interest thereon at the rate of seven percent (7%) per annum from and after December

22  31, 2010.

23        Joel Nagafuji, M.D., Inc., shall recover from Carmel Healthcare Anesthesia Medical

24  Providers, Inc., Richard Kelly, M.D., Inc., and Richard Kelly, M.D., the sum of $98,868, together

25  with interest thereon at the rate of seven percent (7%) per annum from and after December 31, 2010.

26        Andrey Rychcov, M.D., Inc., shall recover from Carmel Healthcare Anesthesia

27  Medical Providers, Inc., Richard Kelly, M.D., Inc., and Richard Kelly, M.D., the sum of $116,962,

28  together with interest thereon at the rate of seven percent (7%) per annum from and after December

EXHIBIT 1     PAGE 43

EXHIBIT 1:  Page 000036 of 000036

1  31, 2010.

2         James Emory Field, M.D., Inc., shall recover from Carmel Healthcare Anesthesia

3  Medical Providers, Inc., Richard Kelly, M.D., Inc., and Richard Kelly, M.D., the sum of $103,201,

4  together with interest thereon at the rate of seven percent (7%) per annum from and after December

5  31, 2010.

6         Michael C. Scannell, M.D., Inc., shall recover from Carmel Healthcare Anesthesia

7  Medical Providers, Inc., Richard Kelly, M.D., Inc., and Richard Kelly, M.D., the sum of $81,397,

8  together with interest thereon at the rate of seven percent (7%) per annum from and after December

9  31, 2010.

10        Sherling Medical, Inc., shall recover from Carmel Healthcare Anesthesia Medical

11  Providers, Inc., Richard Kelly, M.D., Inc., and Richard Kelly, M.D., the sum of $84,485, together

12  with interest thereon at the rate of seven percent (7%) per annum from and after December 31, 2010.

13        Jon D. Stackpole, M.D., Inc., shall recover from Carmel Healthcare Anesthesia

14  Medical Providers, Inc., Richard Kelly, M.D., Inc., and Richard Kelly, M.D., the sum of $114,224,

15  together with interest thereon at the rate of seven percent (7%) per annum from and after December

16  31, 2010.

17        Plaintiffs jointly shall recover from Defendants /Cross-Complainants the sum

18  of $40,480.15 in costs.

19        Cross/Defendants' jointly shall recover from Defendants /Cross-Complainants the sum

20  of $62,786.95 in costs.

21        Cross-Complainants shall recover nothing on their Second Amended Cross-Complaint.

22

23  Dated: January 2, 2017

24                                        Neil L. Shapiro
                                          ARBITRATOR

25

26

27

28

EXHIBIT 1    PAGE 44

**EXHIBIT 2**

54                                                    **EXHIBIT 2**

EXHIBIT 1     PAGE 45

(Page 6 of 9)

Apr 17 2019 09:24:37    16170500000    -->          Fidelity Investments  Page 006

AT-167/EJ-152

| ATTORNEY OR PARTY WITHOUT ATTORNEY (*Name, State bar number, and address*):<br>Brett H. Ramsaur (SBN 281566)<br>Ramsaur Law Office<br>2183 Fairview Road, Suite 221, Costa Mesa, CA 92627<br>TELEPHONE NO.: 949.200.9114    FAX NO.: 714.835.2897<br>E-MAIL ADDRESS: brett@rimsaurlaw.com<br>ATTORNEY FOR (*Name*): Judgment Creditors | LEVYING OFFICER (*Name and Address*): |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY<br>STREET ADDRESS: 1200 Aguajito Road<br>MAILING ADDRESS: 1200 Aguajito Road<br>CITY AND ZIP CODE: Monterey 93940<br>BRANCH NAME: Monterey Courthouse | Los Angeles County Sheriff<br>Civil Division<br>110 N. Grand Avenue, Room 525<br>Los Angeles, CA 90012 |
| PLAINTIFF/PETITIONER: BRIDGET BAILEY-TREGENZA, D.O. et al. | LEVYING OFFICER FILE NO.: |
| DEFENDANT/RESPONDENT: RICHARD KELLY, M.D., et al. | |
| MEMORANDUM OF GARNISHEE Richard John<br>(Attachment–Enforcement of Judgment) Kelly, M.D. Jr | COURT CASE NO.:<br>M106308 |

| NOTICE TO PERSON SERVED WITH WRIT AND NOTICE OF LEVY OR NOTICE OF ATTACHMENT: This memorandum must be completed and mailed or delivered to the levying officer within 10 days after service on you of the writ and notice of levy or attachment unless you have fully complied with the levy. Failure to complete and return this memorandum may render you liable for the costs and attorney fees incurred in obtaining the required information.<br>— RETURN ALL COPIES OF THIS MEMORANDUM TO THE LEVYING OFFICER — | This memorandum does not apply to garnishment of earnings. |
|---|---|

1. a. Garnishee (*name*): Fidelity Brokerage Services, LLC
   b. Address: c/o CT Corporation System, 818 West Seventh Street, Ste. 930 Los Angeles, CA 90017

2. Judgment Creditor (*name*): Bridget Bailey-Tregenza, D.O., et al. (see Attachment A for additional Judgment Creditors)

3. ☐ (*Check if applicable.*) The garnishee holds neither any property nor any obligations in favor of the judgment debtor.

4. If you will not deliver to the levying officer any property levied upon, describe the property and the reason for not delivering it:

5. For writ of execution only. Describe any property of the judgment debtor not levied upon that is in your possession or under your control: FIDELITY BROKERAGE SERVICES (FBS) JOINT BROKERAGE ACCOUNTS XXX-XX2197, $53 (MARKET VALUE) and XXX-XX9937, $8,833 (MARKET VALUE) ARE RESTRICTED PENDING CORRECTED SERVICE ON FBS. THE JOINT ACCOUNT HOLDER IS MARY J. KELLY ON BOTH ACCOUNTS. ALSO, CORPORATE ACCOUNT XXX-XX7832,948 (MARKET VALUE) IN THE NAME OF RICHARD JOHN KELLY A.O., INC. IS. RESTRICTED PENDING CORRECTED SERVICE.

(Continued on reverse)

| Form Approved for Optional Use<br>Judicial Council of California<br>AT-167/EJ-152 [Revised July 1, 2013] | MEMORANDUM OF GARNISHEE<br>(Attachment–Enforcement of Judgment) | Page 1 of 2 | Code Civ. Proc., §§ 488.610,<br>701.030 |
|---|---|---|---|

55                                          FIMS_RETAIL:26521504 EXHIBIT 2

EXHIBIT 1    PAGE 46

(Page 7 of 9)

Apr 17 2019 09:25:01    1617058B000    →    ⋅⋅⋅    Fidelity Investments    Page 007

AT-167/EJ-152

| SHORT TITLE: | LEVYING OFFICER FILE NO.: | CASE NUMBER: |
|---|---|---|
| Bailey-Tregenza v. Kelly | | M106308 |

6. If you owe money to the judgment debtor which you will not pay to the levying officer, describe the amount and the terms of the obligation and the reason for not paying it to the levying officer:

7. Describe the amount and terms of any obligation owed to the judgment debtor that is levied upon but is not yet due and payable:

8. For writ of execution only. Describe the amount and terms of any obligation owed to the judgment debtor that is not levied upon:

9. Describe any claims and rights of other persons to the property or obligation levied upon that are known to you and the names and addresses of the other persons:

**DECLARATION OF GARNISHEE**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  4-19-2019

JOHN STURWAY
(TYPE OR PRINT NAME)                                    (SIGNATURE)

If you need more space to provide the information required by this memorandum, you may attach additional pages.

☑ Total number of pages attached:    1

Page 2 of 2

AT-167/EJ-152 (Rev. July 1, 2013)

**MEMORANDUM OF GARNISHEE**
(Attachment-Enforcement of Judgment)

FIMS_RETAIL:2652105249
EXHIBIT 2

EXHIBIT 1    PAGE 47

# EXHIBIT 3

57                                                                                    **EXHIBIT 3**

EXHIBIT 1     PAGE 48

SHERIFF'S DEPARTMENT
LOS ANGELES COUNTY

NOTICE OF FILING OF
CLAIM OF EXEMPTION
(ATTACHMENT/ENFORCEMENT
OF JUDGMENT)

RAMSAUR LAW OFFICE

2183 FAIRVIEW RD #221
COSTA MESA, CA 92627

Case No.: M106308                                    P


    BAILEY-TREGENZA, BRIDGET  VS  KELLY, RICHARD J

A Claim of Exemption has been filed in the above case.  The property will be
released to the extent it is claimed to be exempt unless you do all the
following within 10 days:

1. File with the court a Notice of Opposition to Claim of Exemption and a
   Notice of Motion for an order determining the Claim of Exemption.

2. File with the Sheriff's Office at the address below a copy of the Notice of
   Opposition to Claim of Exemption and a copy of the Notice of Motion for an
   order determining the Claim of Exemption.




This notice was mailed:

Date : 05/01/19
Place: LOS ANGELES
       California

                        Alex Villanueva, SHERIFF

           By : _____
                LANDY LY, DEPUTY


ADDRESS ALL COMMUNICATION TO:

Sheriff's Office
110 N. GRAND AVE RM 525
LOS ANGELES, CA 90012




                NOTICE OF FILING OF CLAIM OF EXEMPTION
MA1SU30A        (ATTACHMENT/ENFORCEMENT OF JUDGMENT)




                              58                          . EXHIBIT 3

                    EXHIBIT 1    PAGE 49

*[NOT FOR WAGE GARNISHMENT]*
**RETURN TO LEVYING OFFICER. DO NOT FILE WITH COURT**

EJ-160

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*

Richard J. Kelly SBN 191297
31 Mistral Lane
Irvine, California 92617

TELEPHONE NO.: (831) 402-5862    FAX NO. *(Optional):*
E-MAIL ADDRESS *(Optional):*
ATTORNEY FOR *(Name):* Pro Per

FOR LEVYING OFFICER USE ONLY
*(Levying Officer Name and Address)*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**
STREET ADDRESS: 1200 Aguajito Road
MAILING ADDRESS: 1200 Aguajito Road
CITY AND ZIP CODE: Monterey  93940
BRANCH NAME: Monterey Courthouse

PLAINTIFF/PETITIONER: Bridget Bailey-Tregenza, D.O., et al.

DEFENDANT/RESPONDENT: Richard Kelly, M.D.

LEVYING OFFICER FILE NUMBER:

**CLAIM OF EXEMPTION**
(Enforcement of Judgment)

FOR COURT USE ONLY

*Copy all the information required above (except the top left space) from the Notice of Levy. The top left space is for your name or your attorney's name and address. The original and one copy of this form must be filed with the levying officer.*
**DO NOT FILE WITH THE COURT.**

CASE NUMBER:
**M106308**

1. My name is: Richard Kelly
2. Papers should be sent to:
   - [✔] me.
   - [ ] my attorney (I have filed with the court and served on the judgment creditor a request that papers be sent to my attorney and my attorney has consented in writing on the request to receive these papers.)
   - at the address [✔] shown above [ ] following *(specify):*

3. [ ]  I am not the judgment debtor named in the notice of levy. The name and last known address of the judgment debtor *is (specify):*

4. The property I claim to be exempt is *(describe):*
   See Attachment A
5. The property is claimed to be exempt under the following code and section *(specify):*
   See Attachment A
6. The facts which support this claim are *(describe):*
   See Attachment A

7. [ ]  The claim is made pursuant to a provision exempting property to the extent necessary for the support of the judgment debtor and the spouse and dependents of the judgment debtor. **A Financial Statement form is attached to this claim.**

8. [ ]  The property claimed to be exempt is
   a. [ ]  a motor vehicle, the proceeds of an execution sale of a motor vehicle, or the proceeds of insurance or other indemnification for the loss, damage, or destruction of a motor vehicle.
   b. [ ]  tools, implements, materials, uniforms, furnishings, books, equipment, a commercial motor vehicle, a vessel, or other personal property used in the trade, business or profession of the judgment debtor or spouse.
   c. all other property of the same type owned by the judgment debtor, either alone or in combination with others, is *(describe):*

9. [ ]  The property claimed to be exempt consists of the loan value of unmatured life insurance policies (including endowment and annuity policies) or benefits from matured life insurance policies (including endowment and annuity policies). All other property of the same type owned by the judgment debtor or the spouse of the judgment debtor, either alone or in combination with others, is *(describe):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 21, 2019

Richard Kelly
_____
*(TYPE OR PRINT NAME)*

▶ *[signature]*
_____
*(SIGNATURE OF DECLARANT)*

Page 1 of 1

Form Approved by the
Judicial Council of California
EJ-160 [Rev. January 1, 2009]

**CLAIM OF EXEMPTION**
(Enforcement of Judgment)

Code of Civil Procedure, § 703.520
*www.courtinfo.ca.gov*

EXHIBIT 3

EXHIBIT 1    PAGE 50

**CLAIM OF EXEMPTION**

**(Enforcement of Judgment)**

# Attachment A

4. The property I claim to be exempt is:

(1) The value of the property in Fidelity Account number XXX-XX9937 in the amount of $8,833.53

(2) The value of the property in Fidelity Account number XXX-XX2197 in the amount of $53.76

(3) The value of the property in Fidelity Account number XXX-XX7832 in the amount of $48.40

(4) The value of the property in Fidelity University of California 403(b) Retirement Plan Account number XXX-XX6016.

(5) The value of the property in Fidelity University of California 457(b) Retirement Plan Account number XXX-XX5270.

(6) The value of the property in Fidelity 401K Account number XXX-XX2861.

5. The property is claimed to be exempt under the following code and section:

(1) CCP §704.070(b)(1); CCP §704.210

(2) CCP §704.070(b)(1); CCP §704.210

(3) CCP §704.070(b)(1); CCP §704.210

(4) CCP §704.110(b); CCP §704.115; CCP §704.210

(5) CCP §704.110(b); CCP §704.115; CCP §704.210

(6) CCP §704.115; CCP §704.210

6. The facts which support this claim are:

(1) The money that has been deposited into this bank account is repayment to the debtor of loaned money. The funds used by the debtor to loan the money in the first instance was money owned by the debtor that had already been garnished as wages from the debtor's employment at the University of California and therefore

the repayment of these funds to the debtor (without interest) are
exempt from any further garnishment or levy.

(2) The funds in this account are savings from wages that have
already been garnished and are therefore exempt from any further
garnishment or levy.

(3) The funds in this account are savings from wages that have
already been garnished and are therefore exempt from any further
garnishment or levy.

(4) 403(b) retirement account is exempt from levy.

(5) 457(b) retirement account is exempt from levy.

(6) 401K retirement account is exempt from levy.

61                                                      EXHIBIT 3

EXHIBIT 1   PAGE 52

**EXHIBIT 4**

62                                                              **EXHIBIT 4**

EXHIBIT 1    PAGE 53

BRETT H. RAMSAUR
RAMSAUR LAW OFFICE
2183 FAIRVIEW ROAD, SUITE 221   COSTA MESA, CA 92627
Attorney For: JUDGMENT CREDITORS

SBN: 281566

FOR COURT USE ONLY

TELEPHONE NO.:                                    FAX NO. (Optional):
E-MAIL ADDRESS (Optional):

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

STREET ADDRESS: 700 CIVIC CENTER DRIVE WEST
MAILING ADDRESS:
CITY AND ZIP CODE: SANTA ANA, CA 92701
BRANCH NAME: CENTRAL JUSTICE CENTER

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**06/12/2018** at 01:04:00 PM

Clerk of the Superior Court
By e Clerk,Deputy Clerk

Plaintiff: BRIDGET BAILEY-TREGENZA, D.O. ET AL.

Defendant: RICHARD KELLY, MD ET AL.

CASE NUMBER:
30-2017-00907406-CU-EN-CJC

| **PROOF OF SERVICE** | HEARING DATE: 06/21/2018 | DAY: | TIME: 09:00 am | DEPT.: C66 | Ref No. or File No.: |
|---|---|---|---|---|---|

AT THE TIME OF SERVICE I WAS AT LEAST 18 YEARS OF AGE AND NOT A PARTY TO THIS ACTION
I **SERVED COPIES** OF THE FOLLOWING DOCUMENTS:

**APPLICATION AND ORDER FOR APPEARANCE AND EXAMINATION**

PARTY SERVED:          **RICHARD J. KELLY, MD**

DATE & TIME OF DELIVERY:   **06/11/2018**
                          **09:46 am**

ADDRESS, CITY, AND STATE:   **31 MISTRAL LANE**
                            **IRVINE, CA 92617**

PHYSICAL DESCRIPTION:   **Age: 60   Weight: 230LBS   Hair: WHITE**
                        **Sex: Male   Height: 6'0   Eyes: BROWN   Race: CAUCASIAN**

MANNER OF SERVICE:
Personal Service - By personally delivering copies.

Fee for Service:
NATIONWIDE County: **ORANGE**
LEGAL   Registration No.: **PSC-5067**
        **Nationwide Legal, LLC (12-234648)**
        **1609 James M. Wood Blvd., 2nd Fl**
        **Los Angeles, CA 90015**
        **(213) 249-9999**
        **Ref:**

I declare under penalty of perjury under the laws of The
State of California that the foregoing information
contained in the return of service and statement of
service fees is true and correct and that this declaration
was executed on **June 11, 2018**.

Signature: _____

              MIMI MINH LE

982(a)(23)

**PROOF OF SERVICE**
63

Order#: PID4205A/General
**EXHIBIT 4**

EXHIBIT 1    PAGE 54

1    *Bailey-Tregenza D.O., Inc. et al. v. Richard J. Kelly et al.*
   *Case No. M106308*

2

3                     **PROOF OF SERVICE**

       I am employed in the County of Orange, State of California.  I am over the age of 18
4 and not a party to the within action; my business address is 2183 Fairview Road, Suite 221,

5 Costa Mesa, California 92627.

6        On May 16, 2019, I served, in the manner indicated below, the documents described
   as:

7    **NOTICE OF OPPOSITION TO CLAIM OF EXEMPTION (ENFORCEMENT
8    OF JUDGMENT) AND JUDGMENT CREDITORS' MEMORANDUM OF
   POINTS AND AUTHORITIES IN OPPOSITION TO JUDGMENT DEBTOR
9    RICHARD J. KELLY'S CLAIM OF EXEMPTION; SUPPORTING
   DECLARATION OF BRETT H. RAMSAUR**
10

11   on the interested parties in this action by placing true copies thereof, enclosed in
  sealed envelopes, at Castaic, CA, addressed as follows:

12

13                  ***Please see attached Service List***

14

15    ☒    BY REGULAR MAIL:  I caused such envelopes to be deposited in the United
   States mail at Castaic, California, with postage thereon fully prepaid.  I am readily
16    familiar with the firm's practice of collection and processing correspondence for
   mailing.  It is deposited with the United States Postal Service each day and that
17    practice was followed in the ordinary course of business for the service herein
   attested to (C.C.P. § 1013(a)).

18

19    ☐    BY FACSIMILE: (C.C.P. § 1013(e)(f)).

20    ☐    BY OVERNIGHT MAIL:  I caused such envelopes addressed to the offices of the
21    addressees and placing them in in an envelope or package designated by said
   service with delivery fees paid and placing same in a box or other facility
22    regularly maintained by: **[ ] UPS OVERNIGHT SERVICE; [X] U.S.P.S.
   EXPRESS MAIL SERVICE; [ ] FEDERAL EXPRESS; [X] GSO/NORCO
23    OVERNITE.**  (C.C.P. § 1013(c)(d)).

24

25    ☐    BY PERSONAL SERVICE:  I caused such envelopes to be delivered by hand to
   the offices of the addressees. (C.C.P. § 1011(a)(b)).

26

27

28

RAMSAUR LAW OFFICE
2183 FAIRVIEW ROAD, SUITE 221
COSTA MESA, CALIFORNIA 92627

1     ☐     BY ELECTRONIC MAIL: I caused such document(s) to be delivered

2           electronically to the following email address(es).
Richard Kelly rjkellymd@gmail.com; Bruce Dannemeyer

3           Bruce@dreyfusslaw.com; Mary Kelly mjkellynp@gmail.com

4

5        I declare under penalty of perjury under the laws of the State of California that the

6 above is true and correct. Executed on May 16, 2019 at Castaic, California

7

8                            Martha E.Araki



- 2 -

PROOF OF SERVICE

EXHIBIT 1    PAGE 56

1  *Bailey-Tregenza D.O., Inc. et al. v. Kelly et al.*
   *Case No. M106308*

2

3  ## <u>SERVICE LIST</u>

4

| | |
|---|---|
| Richard Kelly<br>31 Mistral Lane<br>Irvine, CA 92617 | *Defendant appearing Pro Se* |
| Richard John Kelly, M.D., Inc.<br>31 Mistral Lane<br>Irvine, CA 92617 | |

EXHIBIT 1    PAGE 57

# EXHIBIT 2

1  DOUGLAS W. OLDFIELD, SBN. 101167
   OLDFIELD & CREELY, LLP
2  26619 Carmel Center Place, Suite 202
   Carmel, California 93923-8656
3  Telephone: (831) 625-3900
   Facsimile:  (831) 625-6043
4
   Attorneys for Plaintiffs and Cross-Defendant
5  Ventana Anesthesia Associates, Inc.

6  BERNARD S. GREENFIELD, SBN. 66017
   BRIAN J. HANNON, SBN. 99750
7  EDWARD T. COLBERT, SBN. 266495
   GREENFIELD DRAA & HARRINGTON LLP
8  55 South Market Street, Suite 1500
   San Jose, California 95113
9  Telephone: (408) 995-5600
   Facsimile:  (408) 995-0308
10
   Attorneys for Cross-Defendants
11 except Ventana Anesthesia Associates, Inc.

**FILED**

2/15/2017

**TERESA A. RISI**

CLERK OF THE SUPERIOR COURT

_X. Cummings_   DEPUTY

Cummings, Lorielle

12

13
SUPERIOR COURT CALIFORNIA, COUNTY OF MONTEREY

14

15  BRIDGET BAILEY-TREGENZA, D.O.;
    et al.                                    **Case No. M106308**

16              Plaintiffs,                   **JUDGMENT**
          vs.
17
    RICHARD KELLY, M.D.; RICHARD
18  KELLY, M.D., INC.; CARMEL
    HEALTHCARE ANESTHESIA MEDICAL
19  PROVIDERS, INC., also known as
    "CHAMP" and DOES 1 THRU 100,
20
               Defendants.
21
    ─────────────────────────────
22  AND RELATED CROSS-ACTION.

    ─────────────────────────────
23
        Upon the granting of Plaintiffs' Petition to Confirm Arbitration Award, and good
24
    cause appearing therefor,
25
        IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Judgment be entered
26
    against Defendants and Cross-Complainants Richard J. Kelly, MD (aka Richard J. Kelly
27
    and Richard John Kelly); Richard John Kelly, MD, Inc.; and Carmel Healthcare Anesthesia
28

─────────────────────────────────────────────
Bailey-Tregenza, et al. v. Kelly, et al., Case No. M106308
JUDGMENT
                        15                                    EXHIBIT 1

EXHIBIT 2    PAGE 58

1  Medical Providers, Inc., jointly and severally, in favor of Plaintiffs and Cross-Defendants, in

2  accordance with the confirmed Arbitration Award attached hereto as Exhibit 1, in the

3  amount of $898,136 plus pre-judgment interest in the amount of $384,280, plus costs on

4  the complaint in the amount of $40,480.15 plus costs on the cross-complaint in the amount

5  of $62,786.95 for a total judgment of $1,385,683.10, allocated among the Plaintiffs and

6  Cross-Defendants as follows:

7      **Bridget Bailey Tregenza, DO, Inc.:** $82,578 plus pre-judgment interest thereon at

8  7% per annum from and after December 31, 2010 in the amount of $35,332 plus costs in

9  the amount of $10,326.50 for a total amount of $128,236.71;

10     **Heinrich A. Brinks, MD, a Professional Corporation:** $60,451 plus pre-judgment

11  interest thereon at 7% per annum from and after December 31, 2010 in the amount of

12  $25,865 plus costs in the amount of $10,326.71 for a total amount of $96,642.71;

13     **James Emory Field, MD, Inc.:** $103,201 plus pre-judgment interest thereon at 7%

14  per annum from and after December 31, 2010 in the amount of $44,156 plus costs in the

15  amount of $10,326.71 for a total amount of $157,683.71;

16     **Arno H. Hanel, MD, Inc.:** $64,450 plus pre-judgment interest thereon at 7% per

17  annum from and after December 31, 2010 in the amount of $27,576 plus costs in the

18  amount of $10,326.71 for a total amount of $102,352.71;

19     **Michael J. Herhusky, MD, Inc.:** $91,520 plus pre-judgment interest thereon at 7%

20  per annum from and after December 31, 2010 in the amount of $39,158 plus costs in the

21  amount of $10,326.71 for a total amount of $141,004.71;

22     **Joel Nagafuji, MD, Inc.:** $98,868 plus pre-judgment interest thereon at 7% per

23  annum from and after December 31, 2010 in the amount of $42,302 plus costs in the

24  amount of $10,326.71 for a total amount of $151,496.71;

25     **Andrey Rychkov, MD, Inc.:** $116,962 plus pre-judgment interest thereon at 7% per

26  annum from and after December 31, 2010 in the amount of $50,044 plus costs in the

27  amount of $10,326.71 for a total amount of $177,332.71;

28     **Michael C. Scannell, MD, Inc.:** $81,397 plus pre-judgment interest thereon at 7%

1  per annum from and after December 31, 2010 in the amount of $34,827 plus costs in the

2  amount of $10,326.71 for a total amount of $126,550.71;

3      **Scherling Medical, Inc.:** $84,485 plus pre-judgment interest thereon at 7% per

4  annum from and after December 31, 2010 in the amount of $36,148 plus costs in the

5  amount of $10,326.71 for a total amount of $130,959.71; and

6      **Stackpole, MD, Inc.:** $114,224 plus pre-judgment interest thereon at 7% per annum

7  from and after December 31, 2010 in the amount of $48,872 plus costs in the amount of

8  $10,326.71 for a total amount of $173,422.71.

9      Judgement on the cross-complaint filed by Richard J. Kelly, MD; Richard John Kelly,

10  MD, Inc.; and Carmel Healthcare Anesthesia Medical Providers, Inc. is hereby entered in

11  favor of cross-defendants, and such cross-complaint is hereby dismissed with prejudice.

12  Dated _____2/15/17_____                    _____
                                            Judge of the Superior Court
13                                              THOMAS W. WILLS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

Bailey-Tregenza, et al. v. Kelly, et al., Case No. M106308
JUDGMENT                                              Page 3 of 3
                         17                           EXHIBIT 1

EXHIBIT 2      PAGE 60

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Jeffrey I. Golden, Chapter 7 Trustee for the estate of Richard J. Kelly and Mary J. Kelly | **DEFENDANTS**<br>Noam Eisen |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Weiland Golden Goodrich LLP<br>650 Town Center Drive Suite 600<br>Costa Mesa, CA 92626 | **ATTORNEYS** (If Known) |

| **PARTY** (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>■ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint For Judgment: (1) Avoiding Fraudulent Transfer Pursuant To 11 U.S.C. § 548(A)(1)(A); (2) Avoiding Fraudulent Transfer Pursuant To 11 U.S.C. § 548(A)(1)(B); (3) Recovery Of Fraudulent Transfer Pursuant To 11 U.S.C. § 550;  (4) Preserving Fraudulent Transfer Pursuant To 11 U.S.C. § 551;  (5) For Imposition Of Resulting Trust; (6) For Declaratory Relief; (7) Turnover Of Property Of The Estate Pursuant To 11 U.S.C. § 542(A); And (8) For Authorization To Sell Real Property In Which Co-Owner Holds Interest Pursuant To 11 U.S.C. § 363(H)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☒ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
■ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Richard J. Kelly and Mary J. Kelly | BANKRUPTCY CASE NO.<br>8:19-bk-12127-MW | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District, Santa Ana Division | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>M. Wallace |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Faye C. Rasch | | |
| DATE<br>09/24/2020 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Faye C. Rasch | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.